**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ARTHUR ESTANISLAU,** | : | **CIVIL ACTION NO.** |
| | : | **3:02CV1515 (PCD)** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **MANCHESTER DEVELOPERS, LLC,** | : | |
| | : | |
| **Defendant.** | : | **MAY 19, 2004** |

**MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION FOR JUDGMENT AS A MATTER OF LAW**

Defendant, by and through undersigned counsel, submits this memorandum of law in support of its motion for judgment as a matter of law pursuant to Rule 50 of the Federal Rules of Civil Procedure.

In this case, Plaintiff seeks the reimbursement of allegedly unpaid wages under the Fair Labor Standards Act ("FLSA") and the Connecticut Wage Payment Laws.

At trial, Plaintiff failed to produce any evidence that he is eligible for coverage under the FLSA as an employee engaged in commerce or the production of goods for commerce or because he is employed by an enterprise with any employees engaged in commerce or the production of goods for commerce.

Further, Plaintiff's evidence of hours worked for which he claims he was not paid consist of broad generalities about things he allegedly did "off hours" with no specific evidence of work performed from which a jury could make a "just and reasonable inference" of hours worked.

### Point I

### PLAINTIFF PRESENTED NO EVIDENCE AT
### TRIAL TO IMPLICATE FLSA COVERAGE

For the FLSA minimum wage and overtime provisions to be applicable to an employee, the employee must either be engaged in commerce or the production of goods for commerce or be employed by an enterprise engaged in commerce or the production of goods for commerce. 29 U.S.C. §§ 206 (a) and 207 (a).

"Commerce" is defined as "trade, commerce, transportation, transmission or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b).

"Goods" is defined as "goods (including ships and marine equipment), wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof." 29 U.S.C. § 203(i).

"Produced" is defined as "produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be

2

deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any closely related process or occupation directly essential to the production thereof, in any State." 29 U.S.C. § 203(k).

There is an important distinction between "individual" and "enterprise" eligibility standards. Under the individual tests, the focus is on whether the employee's duties qualify as being engaged in commerce or engaged in the production of goods for commerce. Under the enterprise theory, the focus is on whether *any* employee of the employer is engaged in commerce or in the production of goods for commerce. More importantly, under the enterprise theory, an employee will be covered by the FLSA if the enterprise "has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person." 29 U.S.C. § 203(s)(1)(A)(i). This provision is absent from the individual tests.

The only evidence of any interstate activity in this case is the fact that Plaintiff was paid out of and received copies of memoranda issued from a New Jersey office from Connecticut. The rest of the evidence presented indicates no commerce or production of goods in commerce by him or by any other employee of the employer. Where the only interstate activity involves the internal operations of the employer, this is an insufficient basis upon which to find that interstate commerce exists. *See Mitchell v. Welcome Wagon, Inc.*, 139 F.Supp. 674 (W.D. Tenn. 1954), *aff'd*, 232 F.2d 892 (6th Cir. 1956). The FLSA claim should be dismissed.

**Point II**

## THERE IS NO BASIS FOR THE JURY TO MAKE A JUST
## AND REASONABLE INFERENCE OF PLAINTIFF'S
## HOURS WORKED BASED UPON HIS TESTIMONY

The unpaid wage claims should also be dismissed because Plaintiff has failed to provide any evidence from which the jury can estimate his alleged unpaid wages as a matter of just and reasonable inference. *Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 688, 66 S. Ct. 1187, 1192-3 (1946). Plaintiff's testimony provided no specifics as to hours worked for which he was not paid or policies consistently applied which deprived him of wages. Rather, his testimony was vague and inconsistent as to the alleged duties and thus forms an insufficient basis for submitting the issue to the jury. *Tele-Sentry Security, Inc. v. Secretary of Labor*, No. 90-0912(RCL) 1991 WL 178135 (D.D.C. 1991) (Lambeth, J.) (copy attached). As found by the Fourth Circuit in *Lee v. Vance Executive Protection, Inc.*, 7 Fed. Appx. 160, 166, 2001 WL108760 (4th Cir. 2001) (copy attached):

> The bulk of the Agents' proof on the second prong concerns work done for demanding clients such as Princess Sarah of the Saudi royal family. Princess Sarah, for example, often asked the Agents to run errands for her after their shifts were scheduled to end. There is much general testimony bout picking up gifts for Princess Sarah's children and paying her bills, but the record is bereft of evidence showing the amount or extent of this extra work. While we acknowledge that the Agents need not 'prove each hour of overtime work with unerring accuracy or certainty,' ... enough evidence must be offered so that the courts 'a matter of just and reasonable inference' may estimate the unrecorded hours, *Mt. Clemens Pottery Co.*, 328 U.S. at 687, 66 S.Ct. at 1187.

4

Like the Agents in *Lee*, Plaintiff's generalities simply do not suffice and the issue should not be submitted to the jury.

Done at Bridgeport, Connecticut, this 19th day of May, 2004.

*Loraine M. Cortese-Costa*

Loraine M. Cortese-Costa
DURANT, NICHOLS, HOUSTON,
HODGSON & CORTESE, COSTA, P.C.
1057 Broad Street
Bridgeport, CT 06604
203-366-3438
Federal Bar No. ct3984

ATTORNEYS FOR DEFENDANT

# CASE APPENDIX

1991 WL 178135
119 Lab.Cas. P 35,534, 37 Cont.Cas.Fed. (CCH) P 76,166
(Cite as: 1991 WL 178135 (D.D.C.))
C

United States District Court, District of Columbia.

TELE-SENTRY SECURITY, INC., Plaintiff,
v.
SECRETARY OF LABOR, Defendant.

Civ. A. No. 90-0912 (RCL).

Aug. 30, 1991.

*MEMORANDUM OPINION*

LAMBERTH, District Judge.

**\*1** This case comes before the court on defendant's Motion To Dismiss And For Summary Judgment ("Defendant's Motion"), and Plaintiff's Motion For Partial Summary Judgment ("Plaintiff's Motion"). Upon consideration of the arguments presented in both motions, the filings relating to those motions, and the administrative record, the court will grant in part and deny in part Defendant's Motion and will deny Plaintiff's Motion.

I. *FACTS*

The present case involves a dispute concerning the wages Tele-Sentry Security, Inc. ("Tele-Sentry"), paid certain employees who worked on two contracts which Tele-Sentry was awarded. The first contract, numbered GS-04-B-81006, was with the General Services Administration ("GSA"), to install a $125,000 security system at the Federal Building and United States Courthouse in Atlanta, Georgia ("Atlanta Contract"). The disputed wage payments cover the period from September of 1981 to October, 1982.

Tele-Sentry hired employees off the unemployment rolls to install conduit, mount electrical boxes, and pull or run electrical wire and cable between the different devices of the security system. Tele-Sentry classified these employees as "electrician-laborers" and paid them $8.43 per hour as listed in the GSA Wage Rate Schedule applicable to the contract. *See* Administrative Record ("AR") at 480-486. Tele-Sentry hired a supervisor to work on the Atlanta Contract. The supervisor was classified as an "electrician" and was paid $15.60 per hour, as required by the Wage Rate Schedule. The supervisor spent most of his time supervising the other employees and made all the electrical connections for the security system.

The second contract, numbered F22600-81-C0028, was awarded to Tele-Sentry on April 7, 1981. The work involved installing smoke detectors and fire alarm equipment in several buildings on the Keesler Air Force Base in Mississippi ("Mississippi Contract"). The contract price was $420,000. The disputed wage payment period runs from September, 1981, through April, 1982. Wage Rate Schedule MS-81-1174 applied to this contract and provided for a wage rate of $13.25 per hour for electricians and $6.80 per hour for laborers.

On the Mississippi Contract, Tele-Sentry hired workers to run conduit, pull wire and cable, and mount electrical connection boxes and fire alarm panels. Tele-Sentry classified these workers as laborers (the applicable Wage Rate Schedule did not list a category of "electrical laborers") and paid them $8.40 per hour. Tele-Sentry classified its supervisor as an "electrician" and paid him $14.02 per hour. When employees installed smoke detectors, they were paid as electricians.

The Department of Labor investigated Tele-Sentry's compliance with the Davis-Bacon Act, 40 U.S.C. § 276(a) *et seq,* and the Contract Work Hours and Safety Standards Act ("CWHSSA"), 40 U.S.C. § 327 *et seq.* A hearing on the Atlanta Contract was held in Atlanta, Georgia, on August 4, 1986. At that hearing, several witnesses testified for the Department of Labor and stated that, in the Atlanta area, electricians performed the tasks of installing conduit, mounting boxes, and pulling wires and cables. AR at 310-15, 331-33, 348-51. One of the Department of Labor's witnesses testified that electrician laborers loaded and unloaded electrical equipment, but did not install any equipment. *Id.* at 327-29.

**\*2** At the hearing on the Atlanta Contract, James E. Watts, president of Tele-Sentry, testified that Tele-Sentry incorporated both the electrician and electrician laborer rates into its bid on the Atlanta project. *Id.* at 402. Watts testified that Tele-Sentry believed that the task of installing conduit, mounting boxes, and pulling wire and cable did not require any electrical skill and that Tele-Sentry had hired all workers who did these tasks off the Atlanta unemployment rolls. *Id.* at 413. Watt's testimony revealed that Tele-Sentry was aware, *before the*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*contract was awarded,* that it was the labor practice in the Atlanta area to have electricians install conduit, mount boxes, and pull wire and cable. While Tele-Sentry disagreed with the classification of electricians, Tele-Sentry never appealed that wage determination either before or after the contract was awarded. *Id.* at 412-13. Watts did testify that David A. Henson, electrical engineer for GSA, approved Tele- Sentry's intended use of electrician laborers to run conduit, *id.* at 398, but Henson denied that he made that representation, *id.* at 361-62, and insisted that he informed Watt that electrician's wages were appropriate for the work to be done under the contract. *Id.* at 362. The Administrative Law Judge ("ALJ"), found that the "thrust of the defense presented in this proceeding is essentially a challenge to the correctness of the wage determination which was not appealed." *Id.* at 1381.

At the August 11, 1986, hearing on the Mississippi Contract, similar facts were elicited concerning the charged Davis-Bacon Act violations. Under the wage schedule applicable to the Keesler Air Force Base locale, electricians had to be paid at least $13.25 per hour and laborers received a minimum of $6.80 per hour. Several witnesses testified for the Department of Labor that, in the locale of the Mississippi contract, electricians did the work of mounting electrical and fire boxes, running conduit, and pulling wires. *Id.* at 846- 47, 861-65, 872-74. Robert D. Foster, Compliance Officer with the Department of Labor's Wage and Hour Division, testified that he saw the workers, whom Tele-Sentry paid $8.40 per hour and classified as laborers, using the tools that electricians normally used. *Id.* at 873.

As to the charged violations of the CWHSSA, Foster testified that each of the ten employees on the Mississippi Contract were required to report at 7:00 a.m. and that each employee actually did work thirty minutes overtime every morning before the start of the recorded work day. *Id.* at 874-75. Tele-Sentry was charged under the CWHSSA for failing to pay these employees for the half-hour of overtime worked between 7:00 a.m. and 7:30 a.m. Because he found that not every worker arrived at 7:00 a.m., Foster deducted one half hour per week from his overtime calculation for each worker. *Id.* at 877.

Four of the nine or ten Tele-Sentry employees claiming entitlement to overtime payments testified about the facts underlying the CWHSSA charge, at the August 11, 1986, hearing. Kenneth L. Burton testified that the workers were told to be at the equipment trailer at "about 7:00 o'clock every morning." *Id.* at 834. Burton claimed he arrived every morning at 7:00 a.m. *Id.* at 837. Joseph D. Smith testified that the workers were asked to "show up five or ten minutes early," *Id.* at 910, and that he came to work at "7:00 or 7:30," *id.* at 895. After being shown a statement he had previously signed concerning the Mississippi Contract, Smith claimed that the project superintendent told him to arrive at 7:00 a.m. and that he arrived at 7:00 a.m. *Id.* at 915. Wayne A. Brady testified that he arrived for work between 7:20 a.m. and 7:25 a.m. each morning. *Id.* at 920. On cross- examination, Brady acknowledged a written statement that he had signed and explained that he was not told to be on the job site at 7:00 a.m. but that some workers voluntarily arrived at work before the 7:30 start time so as to get "ahead of the game in order to meet the quota" of work which Tele-Sentry expected to have completed each day. *Id.* at 926. James C. Auld testified that he "showed up [for work] around 7:15 or 7:20." *Id.* at 950, 961. Upon further questioning by the ALJ, Auld's testimony as to his arrival time varied from 7:10 to 7:20. *Id.* at 962. Auld also testified that the workers "probably showed up" fifteen minutes early. *Id.* at 953. Auld testified that he could not recall ever having been instructed to show up at work at 7:00 a.m. and that he showed up early out of professional courtesy. *Id.* at 962- 64.

*3 In this action, Tele-Sentry, seeks review of the determination promulgated by the Department of Labor's Wage Appeals Board ("Board"), affirming the September 11, 1987, Decision and Order of the ALJ, which found that Tele-Sentry had violated the Davis-Bacon Act by failing to classify and pay as electricians the workers classified as "electrician laborers" and "laborers" respectively on the Atlanta and Mississippi contracts. In affirming the ALJ, the Board adopted the ALJ's decision which found that Tele- Sentry had not paid its employees the wage rate required by the Davis-Bacon Act for the classification of work they performed on the two government contracts and had not compensated its employees for all hours worked, resulting in overtime violations under the CWHSSA. As a result of this finding, the Department of Labor withheld from Tele-Sentry approximately $55,000 as alleged unpaid wages on the Atlanta Contract, and approximately $30,000 of alleged unpaid wages on the Mississippi Contract. The Board unanimously denied Tele- Sentry's motion for reconsideration on June 7, 1989.

II. *LEGAL STANDARDS*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Defendant moves to dismiss plaintiff's claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure , for lack of subject matter jurisdiction. Alternatively, defendant moves for summary judgment under Rule 56(c). Plaintiff moves for partial summary judgment as to the Atlanta Contract charges under Rule 56(c). Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment is appropriate when examination of the record as a whole reveals "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In examining the record, the court must view all inferences in the light most favorable to the non-moving party. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

III. *ANALYSIS*

A. *Davis-Bacon Act Charges*

The Davis-Bacon Act provides that the advertised specifications for federal construction projects requiring the employment of mechanics and/or laborers and which cost over $2,000

shall contain a provision stating the minimum wages to be paid various classes of laborers and mechanics which shall be based upon the wages that will be determined by the Secretary of Labor to be prevailing for the corresponding classes of laborers and mechanics employed on projects of a character similar to the contract work in the city, town, village or other civil subdivision of the State in which the work is to be performed.

40 U.S.C. § 276a(a) (1976). Both the bid invitation and the final contract must include a stipulation requiring that the determined minimum wages be paid and that the applicable wages be posted at the construction site. *Id.* During each week of the contract, the contractor must furnish a statement of the wages paid to each employee during the preceding week. 40 U.S.C. § 276c (1976).

Tele-Sentry presented three defenses before the ALJ. First, Tele-Sentry argued that the work performed on both contracts was not electrical work but electronic work and that the Wage Rate Schedule did not provide a category for such work. Second, Tele-Sentry argued that the work of installing conduit, mounting boxes, and pulling wire and cable does not require electrical skills and so workers who performed those tasks should not be paid as electricians. Finally, as to the Atlanta Contract, Tele-

Sentry argued that GSA employee Henson approved of Tele-Sentry's plan to classify workers in Atlanta as electrician laborers before Tele-Sentry was awarded the contract.

*4 Given the nature of Tele-Sentry's challenge to the findings below, this court lacks jurisdiction to review the Board's finding that Tele-Sentry violated the Davis-Bacon Act on both the Atlanta and Mississippi contracts. The thrust of Tele-Sentry's argument challenges the Department of Labor's classifying one who installs conduit, mounts electrical boxes, and pulls wire and cable, as an "electrician" and not an "electrician laborer" or "laborer." The Supreme Court has stated that the "correctness of the Secretary [of Labor's] wage rate determination [under the Davis-Bacon Act] is not subject to judicial review." *Universities Research Ass'n v. Coutu,* 450 U.S. 754, 761 n. 10 (1981) (citing *United States v. Binghamton Constr. Co.,* 347 U.S. 171, 177 (1954)).

In discussing the Department of Labor's wage-rate determinations, the Court of Appeals for this Circuit stated that the Davis-Bacon Act "delegates to the Secretary, in the broadest terms imaginable, the authority to determine which wages are prevailing." *Bldg. & Constr. Trades' Dept. v. Donovan,* 712 F.2d 611, 616 (D.C.Cir.), *cert. denied* 464 U.S. 1069 (1983). Review of Davis- Bacon Act provisions is limited to due process claims and claims of noncompliance with statutory directives or applicable regulations. *Califano v. Sanders,* 430 U.S. 99, 109 (1977). [FN1] The Department of Labor's classification of the workers based on the tasks they perform is central to the Department of Labor's wage classification. While Tele-Sentry disagreed with the classification, Tele-Sentry either knew (as the testimony at the hearing on the Atlanta Contract showed), or should have found out, prior to bidding, the prevailing practice for electricians in both locales for both projects. With actual or imputed knowledge of the work performed by electricians in each locale, Tele-Sentry should have challenged the classifications prior to bidding or beginning work on the contract. [FN2] The Supreme Court having ruled that courts do not have jurisdiction to review the wage rate determinations, this court lacks jurisdiction to decide the Davis-Bacon charges in this case.

The court notes that Tele-Sentry, both before and after being awarded the contract, had the right to appeal or seek review of the wage determinations at issue in this case. Tele-Sentry did not do so. The Wage and Appeals Board has held:

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

When an interested person in the construction industry desires to challenge a practice of the Labor Department to accept the negotiated wage rates as prevailing without a wage data survey, it is necessary that the attack come before the Labor Department decision becomes the basis upon which bids are taken.   It should not be raised at the enforcement stage.

*In re Fry Brothers Corp.,* WAB Case No. 76-6, CCH Labor Law Reporter, Wages- Hours, Administrative Rulings ¶ 31,113 (1977).  The Board continued:

If a construction contractor who is not bound by classifications of work at which the majority of employees in the area are working is free to classify or reclassify, grade or subgrade traditional craft work as he wishes, such a contractor can, with respect to wage rates, take almost any job away from the group of contractors and the employees who work for them who have established the locality wage standard. [Under an interpretation permitting such contractor action] there [would] be little left to the Davis-Bacon Act.

*5 *Id.*

Tele-Sentry had available avenues to challenge the wage-rate classification before bidding or beginning work on either contract, and should have utilized those avenues.    Given the dispute, Tele-Sentry should have requested an authoritative ruling from the Secretary of Labor.    *Id.*    The Supreme Court has noted that "[d]isputes over the proper classification of workers under a contract containing Davis-Bacon provisions must be referred to the Secretary for determination. *Universities Research Assn. v. Coutu,* 450 U.S. at 761 (citing 41 C.F.R. § 1-18.703-1(i) (1979); 29 C.F.R. § 5.12 (1980).    The applicable regulations provide that any "interested person" can appeal the Secretary of Labor's wage rate determination to the Department of Labor's Wage Appeals Board, "provided review is sought *prior to* the award of the contract at issue." *Id.* (emphasis added) (citing 29 C.F.R. § 1.16 (1980); 29 C.F.R. Part 7 (1980).

Tele-Sentry's third defense to the Davis-Bacon Act charges does not merit relief from this court.   Even assuming as true Tele-Sentry's allegation that Henson orally approved of Tele-Sentry's intention to label workers who installed conduit, mounted boxes, and pulled wire and cable on the Atlanta Contract as "electrician laborers" rather than laborers, that

informal conversation interpreting a classification does not comply with the Department of Labor procedures in 29 C.F.R. § 5.5(a)(1)(ii), which, in relevant part, provides:

In the event the interested parties cannot agree on the proper classification or reclassification of a particular class of laborers and mechanics, including apprentices and trainees, to be used, the question accompanied by the recommendation of the contracting officer shall be referred to the Secretary for final determination.

Furthermore, under the Portal to Portal Act, 29 U.S.C. § 259, only a written ruling of the Secretary of Labor can be relied upon as a defense against liability for wages which must be paid under the Davis-Bacon Act. *Id.* (citing *Hodgson v. Square D. Co.,* 459 F.2d 805 (6th Cir.), *cert. denied,* 409 U.S. 967 (1972)). Tele-Sentry had available avenues for obtaining a written ruling, but failed to pursue them.   The ALJ noted this point:

To challenge a wage determination 29 C.F.R. § 1.8 allows an interested party to seek reconsideration by the Administrator of a wage decision.  29 C.F.R. § 1.9 allows an interested party to appeal the results of its request under § 1.8 to the Wage Appeals Board.

AR at 1617.   The Board also noted this point, stating that the:

Department of Labor has an established procedure for adding, after contract award, additional classifications to wage schedules, and for resolving disagreements as to proposed classifications and wage rates....

*Id.* at 1605.    This procedure was set forth in the regulations applicable at the time of the contracts in question at 29 C.F.R. § 5.5(a)(1)(ii). *Id.* at 1638. Tele-Sentry did not attempt to seek any review of the applicable wage rate determinations at any time. *Id.* at 131.

*6 Tele-Sentry failed to properly challenge, either before or after the award of both contracts, the applicable wage rate determination.   Because this court does not have jurisdiction to review the wage rate determination, that part of Tele-Sentry's complaint seeking review of the agency action concerning the Davis-Bacon Act violations will be dismissed for lack of jurisdiction.

B. *CWHSSA Charge*

Unlike the Davis-Bacon Act charges, this court has jurisdiction to review the CWHSSA charge under the judicial review provisions of the Administrative Procedure Act. The Board is authorized to act with finality on appeals from determinations of the Secretary of Labor. 29 C.F.R. § 7.1(d) (1990); *North Georgia Building and Construction Trades Council v. Goldschmidt,* 621 F.2d 697, 704 (5th Cir.1980). The Board's decision is subject to the arbitrary and capricious standard of review set forth in 5 U.S.C. § 706(2)(A). [FN3] This standard of review is highly deferential to the challenged agency action and presumes that action to be valid. *Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 283 (D.C.Cir.1981) (citing *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416 (1971)). A court must affirm the agency's decision if a rational basis for that decision exists, even if this court disagrees. *Id.* at 283. While deferential to agency action, a court's review of the facts must be searching and careful; the agency's action must be based on a consideration of relevant factors. *Id.* The scope of review of agency action is generally confined to the full administrative record before the agency at the time the agency action was taken. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 419.

While this court finds that the Board's decision upholding the ALJ's finding that Tele-Sentry required its workers on the Mississippi Contract to report to work at 7:00 a.m. was not arbitrary and capricious, the court does, however, find arbitrary and capricious the determination as to amount of overtime wages owed by Tele-Sentry.

As set forth more fully in Part I above, four witnesses testified regarding the facts underlying the CWHSSA charge. Two of the four workers claimed that Tele-Sentry ordered the workers to appear for work at 7:00 a.m. A third worker, Joseph Smith testified that the workers were asked to "show up five or ten minutes early." James Auld, a fourth worker, testified that he showed up early out of professional courtesy. While this court may question the ALJ's determination, based on somewhat equivocal testimony, that Tele-Sentry directed its employees to show up for work at 7:00 a.m., this court cannot find that the ALJ's determination lacks a rational basis.

However, the evidence does not provide a rational basis to conclude that the workers obeyed this directive. Only one of the four workers, Kenneth Burton, testified that he arrived for work at 7:00 a.m. Smith ultimately testified that he arrived at 7:00 a.m. after having been shown a previous statement he had signed. Brady testified that he arrived between 7:20 and 7:25 each morning and Auld testified that he arrived around 7:15 or 7:20.

*7 An employee who alleges he has not been paid due compensation for work performed carries the burden of establishing a prima facie case that "he has in fact performed work for which he was improperly compensated...." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687 (1946). The employee establishes the prima facie case if he "produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* The evidence presented to the ALJ in the present case does not permit a just and reasonable inference that all employees on the Mississippi project were entitled to overtime compensation. The court is aware that "each employee need not testify in order to make out a prima facie case of the number of hours worked as a matter of 'just and reasonable inference.' " *Donovan v. New Floridian Hotel, Inc.,* 676 F.2d 468, 472 (11th Cir.1982) (citation omitted). However, where the evidence is as disparate as it is in this case as to the fact of timely arrival at 7:00 a.m. of a representative number of the Tele-Sentry employees claiming entitlement to overtime compensation, neither the ALJ, nor the Wage Appeals Board had a rational basis upon which to infer that Tele-Sentry under-compensated all its employees. *See Janik Paving & Constr. Inc. v. Brock,* 828 F.2d 84, 94 (2d Cir.1987) (recognizing that testimony of alleged representative number of employees claiming entitlement to additional compensation can be too vague to demonstrate with adequate precision the amount and extent of undercompensated overtime work for each affected employee). While some employees in the present case may be entitled to back pay for uncompensated time (i.e. Burton and Smith), the evidence does not support awarding all workers overtime from 7:00 a.m. (even with the one-half hour weekly deduction), where there is insufficient evidence that all of the employees arrived at 7:00 a.m. The tardy employees are not entitled to a windfall at the employer's expense. The ALJ's determination that Tele-Sentry's employees on the Mississippi actually began "work thirty minutes prior to their recorded starting time," AR at 1389, is not rationally supported by the evidence produced before the ALJ. Lacking evidentiary support, the court finds this part of the ALJ's decision, and the Wage

Appeals Board's affirmance of that decision, to be arbitrary and capricious. For these reasons, the Board's affirmance of the ALJ's decision finding the CWHSSA violation will be remanded for further proceedings consistent with this opinion.

A separate order will issue this date.

> FN1. In its complaint, Tele-Sentry did not claim any denial of due process or noncompliance with statutory directives or applicable regulations.

> FN2. The court is disturbed by facts elicited at the August 4, 1986 hearing on the Atlanta Contract insofar as they show that GSA knew that Tele-Sentry incorporated electrician laborer wage rates into its low bid. The facts also show that GSA knew that, after telling Tele-Sentry that electrician wages had to apply, and after giving Tele-Sentry the opportunity to confirm its bid, Tele-Sentry confirmed its original bid without noting any errors or exception. AR at 358-60. Nevertheless, GSA accepted Tele-Sentry's bid. In addition, although Tele-Sentry submitted weekly payroll statements which clearly showed that Tele-Sentry was incorrectly paying the workers in question the wages applicable to electrician laborers, neither GSA nor the Department of Labor objected until after the Atlanta Contract had been completed. Given Tele-Sentry's submission of these statements, the court can impute GSA's and the Department of Labor's knowledge of Tele-Sentry's violation of the Davis- Bacon Act back to the second week of work on the Atlanta Contract. Being without jurisdiction over the Davis-Bacon Act charges, however, this court is powerless to invoke principles of estoppel or require the government to compensate Tele-Sentry by having the government reimburse Tele-Sentry for the difference between the wages paid and those wages which should have been paid to the disputed workers.

> FN3. At first glance, it appears that the present case is reviewable under the "substantial evidence" standard of the APA insofar as the CWHSSA expressly provides that "final orders of ... the Secretary [of Labor] ... shall be conclusive with regard to findings of fact *if such findings are supported by substantial evidence.*" 40 U.S.C. § 330(c) (emphasis added). Moreover, the APA provides that this court can set aside agency findings and conclusions which it finds to be "unsupported by substantial evidence ... or otherwise reviewed on the record of an agency action hearing provided by statute...." 5 U.S.C. § 706(2)(E). However, this Circuit has noted that the substantial evidence standard o: § 706(2)(E) applies only in cases where an agency hearing is provided by statute, and *not* where a hearing is provided only by Justice Department regulation. *Michigan Citizens For An Independent Press v. Thornburgh,* 868 F.2d 1285, 1291 n. 6 (D.C.Cir.1989). In the present case § 706(2)(E) is inapplicable because a hearing is provided by Labor Department regulation, not by statute. At any rate, the distinction between application of the arbitrary and capricious standard as opposed to the substantial evidence standard is unimportant insofar as this Circuit has expressly found that the "meaning of the 'substantial evidence' terminology connotes a substantive standard no different from the arbitrary or capricious test." *Id.* (quoting *Association of Data Processing Orgs., Inc. v. Board of Governors,* 745 F.2d 677, 685 (D.C.Cir.1984).

1991 WL 178135, 1991 WL 178135 (D.D.C.), 119 Lab.Cas. P 35,534, 37 Cont.Cas.Fed. (CCH) P 76,166

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Client Identifier: **MANCHESTER/3**
Date of Request: 05/19/2004
The Current Database is CTA

7 Fed.Appx. 160                                                                Page 23
**(Cite as: 7 Fed.Appx. 160, 2001 WL 108760 (4th Cir.(Va.)))**
▷

Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter.

UNPUBLISHED

Please use FIND to look at the applicable circuit court rule before citing this opinion. Fourth Circuit Rule 36(c). (FIND CTA4 Rule 36(c).)

United States Court of Appeals,
Fourth Circuit.

Robert J. LEE; David P. Brady; C. Brian Diggs;
Mark E. Fair; Martin D.
Hare; Douglas O. Henderson; Rich A. Lopez; John
V. O'Hara; Dominic A.
Sabruno; Gary A. Thorn, Jr.; William A. Tinsley;
Charles L.
Breeden; Vance E. Morris; Todd K. Molter,
Plaintiffs-Appellants,
and
Terrance M. Hinton, Plaintiff,
v.
VANCE EXECUTIVE PROTECTION,
INCORPORATED, Defendant-Appellee.

No. 00-1330.

Argued Dec. 6, 2000.
Decided Feb. 8, 2001.

The United States District Court for the Eastern District of Virginia, James C. Cacheris, Senior Judge, granted summary judgment in favor of employer on bodyguards' Fair Labor Standards Act (FLSA) claim seeking overtime compensation, and bodyguards appealed. The Court of Appeals held that bodyguards were paid a day rate and therefore did not come within FLSA exclusion permitting employers to exclude "extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of the employee's normal working hours or regular working hours."

Affirmed in part, reversed in part, and remanded with instructions.

West Headnotes

[1] Labor Relations ⚫══1272.1

232Ak1272.1

Bodyguards were paid a day rate and therefore did not come within Fair Labor Standards Act (FLSA) exclusion permitting employers to exclude "extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked in excess of the employee's normal working hours or regular working hours;" bodyguards were paid a flat sum for a day's work without regard to the number of hours worked in the day pursuant to a split-day compensation scheme in which the normal workday is artificially divided into a "straight time" period to which one rate was assigned, followed by a so-called "overtime" period for which a higher rate was specified. Fair Labor Standards Act of 1938, § 7(e)(5), 29 U.S.C.A. § 207(e)(5); 29 C.F.R. § 778.202(c); 29 C.F.R. § 788.112.

[2] Federal Civil Procedure ⚫══2498
170Ak2498

Genuine issue of material fact existed as to the amount and extent of hours worked in excess of forty per week, precluding summary judgment in favor of employees on their Fair Labor Standards Act (FLSA) claims for compensation for hours worked in excess of forty per week that are not reflected in employer's records. 29 C.F.R. § 516.2(a)(7).

[3] Labor Relations ⚫══1478.1
232Ak1478.1

Consents to become a party which are not filed with the Fair Labor Standards Act (FLSA) complaint do not relate back. Portal-to-Portal Act of 1947, § 7(b), 29 U.S.C.A. § 256(b).

[4] Labor Relations ⚫══1492.1
232Ak1492.1

Suit against employer under Fair Labor Standards Act (FLSA) was a collective action; paragraph in complaint and amended complaint stated that "[p]laintiffs bring this action on behalf of themselves and all other employees similarly situated." Fair Labor Standards Act of 1938, § 16(b), 29 U.S.C.A. § 216(b).

**\*161** Appeal from the United States District Court for the Eastern District of Virginia, **\*162** at Alexandria. James C. Cacheris, Senior District Judge. (CA-99-887-A).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Charles W. Gilligan, O'Donoghue & O'Donoghue, Washington, DC, for appellants. Douglas Bennett Mishkin, Patton Boggs, L.L.P., McLean, VA, for appellee. ON BRIEF: Sally M. Tedrow, Dinah S. Leventhal, O'Donoghue & O'Donoghue, Washington, DC, for appellants.

Before TRAXLER and KING, Circuit Judges, and BOYLE, Chief United States District Judge for the Eastern District of North Carolina, sitting by designation.

OPINION

PER CURIAM.

**1 Present and former executive protection agents ("Agents") appeal from a grant of summary judgment in favor of their employer Vance Executive Protection, Inc., ("Vance") on the Agents' Fair Labor Standards Act ("FLSA") claim seeking overtime compensation. We affirm in part, reverse in part, and remand with instructions.

I.

Agents employed by Vance serve as bodyguards for corporate officers and visiting dignitaries who contract with Vance for security services. The parties agree that the Agents typically work twelve-hour shifts, but on occasion are required to work more than twelve hours depending on the needs of the client. According to Vance's Operational Guidelines Manual, an Agent is paid a "Daily Rate" for working a shift. J.A. 734. The most junior Agents earn $145 per shift and the most senior Agents earn in excess of $200 per shift. If circumstances require that an Agent work, for example, thirteen or fourteen hours, the Agent will not receive more than the established shift rate.

The dispute between the parties centers on whether Vance's compensation plan violates the FLSA's requirement that an employee receive "one and one-half times the regular rate at which he is employed" for hours worked in excess of a forty-hour workweek. 29 U.S.C.A. § 207(a)(1) (West 1998). Vance contends that the FLSA's overtime requirement is already built into its compensation system. According to Vance, Agents are paid straight time for the first eight hours of a shift and double-time for the remaining four. The Agents, on the other hand, argue that the eight-four split is but an accounting mechanism used to avoid the FLSA's overtime

requirements. The Agents assert that they are paid a day rate and that their regular hourly rate should be determined by totaling all sums received in a workweek and dividing by the total hours worked. See 29 C.F.R. § 778.112 (2000). Such a calculation yields a much higher regular hourly rate than does Vance's.

The following example illustrates the dispute between the parties. If an Agent earns $165 per shift and works six twelve-hour shifts in one workweek, the gross amount he receives from Vance is $990 for the seventy-two hours worked. Assuming this is a day rate, the Agent would calculate his regular hourly rate by dividing $990 by seventy-two hours, which yields an hourly rate of $13.75. Under the FLSA the first forty hours should be paid at $13.75 per hour for a total of $550, and the remaining thirty-two hours of overtime at time and a half ($20.625 per hour) for an overtime amount of $660. The overtime and non-overtime payments yield a total of $1,210, and hence the Agent argues he is due $220 from Vance ($1,210-$990).

Under Vance's more complicated calculation, which requires use of a multiplier of 1/16 , the Agent's hourly wage for the first eight hours is $10.3125 (1/ 16 of $165). *163 Thus, the Agent earns $412.50 for the first forty hours worked and $577.50 for the remaining thirty-two. Dividing $577.50 by thirty-two hours yields an overtime rate in excess of $18, well above the time and a half required by law. Hence, Vance denies the Agent is owed any compensation.

**2 Hearing cross motions for summary judgment, the district court rejected the Agents' assertion that they are paid a day rate and concluded that Vance's division of the workday is not prohibited by the FLSA. However, the court held that Vance's compensation plan passes muster only if the Agents actually work twelve hours every shift, or a limited number of additional hours which are covered by Vance's double-time payments. Though the court recognized that it is possible for the Agents to have worked hours for which they were not compensated, the court found that the Agents had failed to offer sufficient proof of the number of uncompensated hours worked. The Agents appeal the district court's grant of summary judgment as well as issues relating to the statute of limitations.

II.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

A summary judgment motion should be granted only if there is no genuine dispute as to an issue of material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). "When reviewing cross-motions for summary judgment, we may, if appropriate, direct entry of judgment in favor of the party whose motion was denied by the district court." *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.,* 118 F.3d 1018, 1020 (4th Cir.1997); *see also Monahan v. County of Chesterfield,* 95 F.3d 1263, 1265 (4th Cir.1996).

As a general rule, the FLSA provides that an employer must pay an employee one and one-half times the employee's "regular rate" for all hours worked in excess of forty per week. *See* 29 U.S.C.A. § 207(a)(1). The "regular rate" is the hourly rate that the employer pays the employee "for the normal, non-overtime workweek." *Walling v. Youngerman-Reynolds Hardwood Co.,* 325 U.S. 419, 424, 65 S.Ct. 1242, 89 L.Ed. 1705 (1945). Normally, the regular rate is arrived at by "dividing [the] total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked." 29 C.F.R. § 778.109 (2000).

The exclusion central to the present case is found in 29 U.S.C.A. § 207(e)(5). This statutory provision permits employers to exclude "extra compensation provided by a premium rate paid for certain hours worked by the employee in any day or workweek because such hours are hours worked ... in excess of the employee's normal working hours or regular working hours." 29 U.S.C.A. § 207(e)(5). For example,

> [i]f an employee whose maximum hours standard is 40 hours is hired at the rate of $5.75 an hour and receives, as overtime compensation under his contract, $6.25 per hour for each hour actually worked in excess of 8 per day (or in excess of his normal or regular daily working hours), his employer may exclude the premium portion of the overtime rate from the employee's regular rate and credit the total of the extra 50 cent payments thus made for daily overtime hours against the overtime compensation *164 which is due under

the statute for hours in excess of 40 in that workweek.

**3 29 C.F.R. § 778.202(c) (2000). Exemptions must be narrowly construed and the burden is on Vance "to show that it is entitled to the benefits of th[e] exceptions." *Johnson v. City of Columbia,* 949 F.2d 127, 130 (4th Cir.1991) (en banc).

Though specifically permitting a premium for hours worked in excess of regular working hours, the regulations prohibit split-day compensation schemes in which "the normal workday is artificially divided into a 'straight time' period to which one rate is assigned, followed by a so-called 'overtime' period for which a higher 'rate' is specified." 29 C.F.R. § 778.202(c); *see also Walling v. Helmerich & Payne, Inc.,* 323 U.S. 37, 38-39, 65 S.Ct. 11, 89 L.Ed. 29 (1944); 29 C.F.R. § 778.501 (2000). To permit such divisions would undermine the FLSA's objectives of spreading work and compensating employees for excessive hours worked. *See Helmerich & Payne, Inc.,* 323 U.S. at 40, 65 S.Ct. 11.

Of course, the Department of Labor through its interpretation of the FLSA recognizes that not all employees entitled to overtime compensation are paid by the hour. Some workers, for example, contract to be paid on a piece rate or a day rate basis and the regulations explain how to calculate the regular rate for these employees. *See* 29 C.F.R. §§ 778.111-.112 (2000). The Agents contend that they are paid a flat sum for a day's work and consequently their overtime rate should be calculated pursuant to 29 C.F.R. § 778.112, which provides:

> If the employee is paid a flat sum for a day's work or for doing a particular job, without regard to the number of hours worked in the day or at the job, and if he receives no other form of compensation for services, his regular rate is determined by totaling all the sums received at such day rates or job rates in the workweek and dividing by the total hours actually worked. He is then entitled to extra half-time pay at this rate for all hours worked in excess of 40 in the workweek.

29 C.F.R. § 778.112.

[1] The primary issue in this case is whether the Agents are paid a day rate. Resolution of this issue then dictates the proper result under the FLSA. Because this question is before us on cross motions for summary judgment and because there are no genuine issues of material fact, our decision becomes one of law. We believe, however, the law dictates a conclusion different from that of the district court.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Vance's Operational Guidelines Manual describes the Agents' pay structure as a "Daily Rate" which increases as an Agent gains seniority. J.A. 734. The Manual further provides that Agents normally work a minimum of twelve hours per day "with additional hours often arising from relief response, protectee's movements, advances, luggage details or other unforseen circumstances." J.A. 677. Vance officials testified that if an Agent is required to work, for instance, fourteen or fifteen hours in a day because of some exigency, the Agent receives no additional compensation. In the rare case that an Agent receives an assignment requiring him to work only eight hours, the Agent still earns the same amount he normally receives for a twelve- or fourteen-hour day. Documents provided to detail leaders attending a Vance seminar listed the "average daily rate" paid to Agents as $153.93, and made no mention of hourly rates. When filling out employment verification forms for entities dealing with the Agents, Vance officials noted that the Agents were paid "per day" even though there was a "per hour" option on the forms. J.A. 650-51. In addition, the Agents testified that **165 when they were hired Vance officials never mentioned anything about an hourly rate; the Agents' compensation was always explained to them in terms of a daily rate.

**4 Vance officials counter that they described the Agents' pay as a "daily rate" because it was "the simplest term we have been able to use to tell our employees how much they can expect to be paid for a 12 hour shift." J.A. 382. Vance officials also contended that the Agents did not "want to associate an hourly rate with the work that they do," and therefore Vance used the term "daily rate" to assuage the Agents' egos. J.A. 471. Other than payroll documents, Vance officials could point to no documents available to the Agents that specified an hourly rate of employment.

At appellate argument, Vance made much of the fact that the Agents' pay stubs split the gross amount earned into "regular" and "doubletime." See J.A. 779. However, the pay stubs never specified an hourly rate and testimony from Vance officials indicated that the actual calculation of the hourly rates was left to the human resources department and that such information was not readily available to the Agents.

In light of the foregoing, we can find no genuine issue of material fact regarding the Agents' rate of pay. Unquestionably, Vance Agents are "paid a flat

sum for a day's work ... without regard to the number of hours worked in the day." 29 C.F.R. § 788.112; see also Dufrene v. Browning-Ferris, Inc., 207 F.3d 264, 266 (5th Cir.) (describing employees who "were guaranteed a day's pay, regardless of the hours worked that day" as day-rate employees), cert. denied, 531 U.S. 825, 121 S.Ct. 72, 148 L.Ed.2d 36 (2000). Vance represented to its Agents and the world that the Agents were paid day rates. The pay stubs did reflect a regular and double-time component, but the stubs standing alone cannot compete with the plethora of evidence indicating that the Agents were paid a day rate. See Brennan v. Elmer's Disposal Serv., Inc., 510 F.2d 84, 88 (9th Cir.1975) (holding that pay stubs alone were not sufficient to establish an employee's regular rate); see also Anderson, 477 U.S. at 251, 106 S.Ct. 2505 (a scintilla of evidence is insufficient to bar summary judgment). The alleged hourly rate paid to the Agents is in reality but a form of mathematical legerdemain used by Vance to avoid the implications of the FLSA. Accordingly, the district court erred in awarding summary judgment to Vance on the grounds that the Agents were paid by the hour and that no overtime was owed in light of the premium paid to the Agents. [FN1] We reverse the district court on this matter and remand for the entry of summary judgment in favor of the Agents. See Ralph's Grocery Co., 118 F.3d at 1020.

FN1. Because we conclude that the Agents were paid a day rate, we need not determine whether Vance's compensation scheme violates the FLSA's prohibition against split-day plans.

III.

The Agents also seek compensation for hours worked in excess of forty per week that are not reflected in Vance's records. As discussed in the previous section, the parties do not dispute that on occasion the Agents' shifts lasted longer than twelve hours. The regulations implementing the FLSA mandate that the employer keep records of the "[h]ours worked each workday" by all employees. 29 C.F.R. § 516.2(a)(7) (2000). Vance admits that it did not keep proper records, and the Supreme Court has held that in such a situation an employee should not be penalized "on the ground that he is unable to prove *166 the precise extent of uncompensated work." Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946).

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

**\*\*5** When an employer's records are inadequate or inaccurate, an employee carries his burden under the law by (1) "prov[ing] that he has in fact performed work for which he was improperly compensated," and (2) "produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* If the employee carries his burden, "[t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 687-88, 66 S.Ct. 1187. If the employer cannot "produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Id.* at 688, 66 S.Ct. 1187.

[2] Though the Agents have easily satisfied the first prong of their burden by proving that they performed work for which they were not compensated, we agree with the district court that the Agents have not come forward with "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* at 687, 66 S.Ct. 1187. The bulk of the Agents' proof on the second prong concerns work done for demanding clients such as Princess Sarah of the Saudi royal family. Princess Sarah, for example, often asked the Agents to run errands for her after their shifts were scheduled to end. There is much general testimony about picking up gifts for Princess Sarah's children and paying her bills, but the record is bereft of evidence showing the amount or extent of this extra work. While we acknowledge that the Agents need not "prove each hour of overtime work with unerring accuracy or certainty," *Pforr v. Food Lion, Inc.,* 851 F.2d 106, 108 (4th Cir.1988), enough evidence must be offered so that the court as "a matter of just and reasonable inference" may estimate the unrecorded hours, *Mt. Clemens Pottery Co.,* 328 U.S. at 687, 66 S.Ct. 1187. Because there is insufficient evidence to estimate the amount and extent of hours worked in excess of forty per week, we affirm the grant of summary judgment as to the unrecorded hours. [FN2]

> FN2. Where the hours worked in excess of forty per week were recorded by Vance, the Agents are, of course, able to prove them with specificity.

IV.

[3] The Agents also challenge the district court's ruling that the statute of limitations for Agents Vance

E. Morris and Todd K. Molter would only run back from December 21, 1999, the day these two Agents filed their consents. Under the FLSA, an employee may bring an action on behalf of similarly situated employees who must opt-in to the suit by filing written consents with the district court. *See* 29 U.S.C.A. § 216(b) (West 1998) ("An action to recover [unpaid overtime] ... may be maintained against any employer ... by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed."). An FLSA collective action is deemed commenced for an individual plaintiff "on the date when the complaint is filed, if he is specifically named as a party **\*167** plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court." 29 U.S.C.A. § 256(a) (West 1998). For plaintiffs not named in the original complaint, a collective action under the FLSA commences "on the subsequent date on which [the plaintiffs'] written consent is filed in the court." 29 U.S.C.A. § 256(b); *see also Songu Mbriwa v. Davis Memorial Goodwill Indus.,* 144 F.R.D. 1, 2 (D.D.C.1992) ("Until a plaintiff, even a named plaintiff, has filed a written consent, [ ]he has not joined in the class action, at least for statute of limitations purposes."). In other words, consents not filed with the complaint do not relate back.

**\*\*6** Though not named in the original complaint, Morris and Molter were named in the amended complaint filed in September 1999. However, the consent forms for these two agents were not filed with the court until December 21, 1999. Examining the statute of limitations as of the filing of the consents rather than the filing of the action, especially in the case of Morris, affects the amount of damages, if any, these two Agents can recover. *See* 29 U.S.C.A. § 255(a) (1998) (stating that the statute of limitations for an action seeking overtime compensation is two years and in cases of willful violation of the FLSA it is three years). [FN3] The Agents argue that the suit against Vance was not a collective action and therefore no consent forms were required. The fact that Morris and Molter did not file consent forms until December 1999, so the argument goes, should in no way affect the period of time for which they are entitled to recover damages.

> FN3. Morris was terminated on July 27, 1997, and Molter was terminated on

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

September 13, 1999. If on remand, the district court determines that the limitations period is two rather than three years, Morris would collect no damages. Molter's damages would also be affected, but not to the same degree.

[4] The complaint and amended complaint, however, make clear that the suit against Vance is a collective action. The seventh paragraph in both documents states that "[p]laintiffs bring this action on behalf of themselves and all other employees similarly situated." J.A. 11, 68. Yet, the Agents argue that a collective action was never pursued and that the suit against Vance was simply fifteen individual actions joined under Federal Rule of Civil Procedure 20(a). We disagree.

The purpose of the consent forms is "to make ... uncertain plaintiffs certain, and actual participants, so that defendants could know the parties and the charges with which they were to be faced." *Deley v. Atlantic Box & Lumber Corp.,* 119 F.Supp. 727, 728 (D.N.J.1954). Otherwise, one employee could sue on behalf of similarly situated employees "without the specific rights of the others ever being actually considered." *Id.* The consent form requirement clearly enures to the benefit of employers by making them aware of what allegations they face and from whom the allegations originate. We can find nothing in the record to indicate that the Agents ever considered their suit to be anything but a collective action or that the Agents represented to Vance or the district court that their action was not collective; therefore, we decline to inject uncertainty into the law by permitting plaintiffs to change the nature of their action in the middle of judicial proceedings without proper notice to the court and employer. If a group of plaintiffs decided to abandon a collective action and instead simply join their individual actions under Rule 20(a), they could, for example, move to amend the pleadings pursuant to Rule 15(a), *168 which provides leave to freely amend pleadings "when justice so requires." But nothing indicates to us that the Agents so changed their action, and therefore we affirm the district court's decision regarding the necessity of consent forms for the present case. [FN4]

> FN4. Prior to appellate argument, Vance moved pursuant to Local Rule 28(b) for leave to attach various items to its brief. Because Vance has not shown good cause as required by the Rule, we deny the motion.

V.

For the foregoing reasons we reverse the district court's grant of summary judgment for Vance on the Agents' compensation scheme and remand with instructions for the entry of summary judgment in favor of the Agents. We affirm the district court's decision that the Agents cannot recover overtime compensation for unrecorded hours worked in excess of forty per week because the Agents did not come forward with sufficient evidence to show the amount and extent of the work. Finally, we affirm the district court's decision that the Agents pursued a collective action and therefore the statute of limitations for Morris and Molter runs back from the date their consent forms were filed with the district court.

**7 *AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.*

7 Fed.Appx. 160, 2001 WL 108760 (4th Cir.(Va.))

Briefs and Other Related Documents (Back to top)

. 2000 WL 33989867T2 (Appellate Brief) Appellants' Reply Brief (Aug. 24, 2000)Original Image of this Document with Appendix (PDF)

. 2000 WL 33989868T2 (Appellate Brief) Brief of Appellee (Aug. 2000)Original Image of this Document with Appendix (PDF)

. 2000 WL 33989869T2 (Appellate Brief) Brief of Appellants (Jun. 09, 2000)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

## CERTIFICATION

This is to certify that I have caused to be served the foregoing via hand delivery, this 19th

day of May, 2004 to all counsel and *pro se* parties as follows:

Marc Mercier, Esq.
Beck & Eldergill, PC
447 Center Street
Manchester, CT 06040

*Loraine M. Cortese-Costa*
Loraine M. Cortese-Costa

P:\lit\LCC\586800\003\00040016.DOC