Not Reported in F.Supp.2d                                                    Page 1
2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

United States District Court,
S.D. New York.

John KUPER, Plaintiff,
v.
EMPIRE BLUE CROSS & BLUE SHIELD, Defendant.

**No. 99 Civ. 1190.**

Feb. 18, 2003.


Former employee brought action against former employer, alleging that he had been fired due to his bilateral hearing loss, in violation of the Americans with Disabilities Act (ADA) and the New York Human Rights Law (NYHRL). Following jury trial in favor of plaintiff, defendant moved for judgment as matter of law (JMOL) as to punitive damages and back pay awards, for a new trial, and for remittitur. The District Court, Gwin, J., held that: (1) evidence was sufficient to support punitive damages award; (2) employee made reasonable efforts to mitigate damages; (3) factors supported award of punitive damages; (4) employee's emotional distress was not garden variety; and (5) award of $62,500 damages on emotional distress claim was not miscarriage of justice.

Motions denied.

West Headnotes

**[1] Federal Civil Procedure** 👈2602
170Ak2602 Most Cited Cases
   Defendant, in moving for judgment as matter of law (JMOL) at the close of plaintiff's evidence, failed to meet specificity requirement by identifying specific element that was allegedly inadequately supported, and thus motion for JMOL after judgment could only be granted on a showing of manifest injustice. Fed.Rules Civ.Proc.Rule 50, 28 U.S.C.A.

**[2] Civil Rights** 👈1575(1)
78k1575(1) Most Cited Cases
   (Formerly 78k275(1))

**[2] Civil Rights** 👈1769
78k1769 Most Cited Cases
   (Formerly 78k454)
   Evidence was sufficient to show that former employer was malicious or acted with reckless indifference, as required to support punitive damages award to employee who alleged he was terminated due to bilateral hearing loss, in violation of Americans with Disabilities Act (ADA) and New York Human Rights Law (NYHRL); senior officer who terminated employee testified that she was aware of the ADA's prohibition against disability discrimination, had been trained in ADA, and was responsible for employer's ADA compliance, and other employees gave terminated employee false and misleading information about potential jobs. 42 U.S.C.A. § 1981a(b)(1); Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[3] Civil Rights** 👈1575(1)
78k1575(1) Most Cited Cases
   (Formerly 78k275(1))
   Evidence was insufficient to show that former employer's good faith efforts to comply with the ADA would bar punitive damages award, in action by employee who alleged he was terminated due to bilateral hearing loss; although employer offered evidence that it had an anti-discrimination policy, it offered no evidence that it enforced that policy. 42 U.S.C.A. § 1981a(b)(1); Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[4] Civil Rights** 👈1573
78k1573 Most Cited Cases
   (Formerly 78k272)
   Former employee made reasonable efforts to conduct good-faith job search, as would satisfy mitigation of damages requirement for award of back pay on employee's ADA

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 2
2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

wrongful termination claim against employer; for the first five months after discharge, employee, who had been a fraudulent insurance claims manager, contacted "every insurance company in the New York metropolitan area," and after those efforts yielded no results, he reviewed the classified newspaper advertisements weekly. 42 U.S.C.A. § 1981a(b)(1); Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[5]** Civil Rights 🗝1575(1)
78k1575(1) Most Cited Cases
    (Formerly 78k275(1))
Reprehensibility factor supported award of punitive damages to former employee who had asserted wrongful termination claims against employer, under the ADA; employer acted deceitfully in not telling employee about an open position after he asked about available positions, and supervisor who terminated employee testified that she was aware of applicable civil rights laws and that she was responsible for ensuring compliance. 42 U.S.C.A. § 1981a(b)(1); Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[6]** Civil Rights 🗝1575(2)
78k1575(2) Most Cited Cases
    (Formerly 78k275(1))
Ratio of punitive damages to compensatory damages award was not disproportionate, in former employee's wrongful termination action against former employer, alleging that employee was terminated due to bilateral hearing loss, in violation of ADA; compensatory damages award, including both back and front pay, was $178,878 and punitive damages award was $200,000, and employer had over 6,000 employees and had recently paid state over $1 billion to become a for-profit corporation. 42 U.S.C.A. § 1981a(b)(1); Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[7]** Civil Rights 🗝1575(2)
78k1575(2) Most Cited Cases
    (Formerly 78k275(1))
Comparison of $262,500 punitive damages award, in former employee's ADA wrongful termination suit, to statutory limit of $300,000 supported jury's punitive damages verdict against former employer; employer had over 6,000 employees and recently paid the state over $1 billion for the right to become a for-profit corporation. 42 U.S.C.A. § 1981a(b)(3)(D); Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[8]** Federal Courts 🗝415
170Bk415 Most Cited Cases
Federal law, rather than state law, would apply to determine whether compensatory damage award was excessive, in former employee's ADA wrongful termination suit against former employer, although employee asserted related state law claim; jury award did not exceed the federal statutory maximum, the action was a federal question suit, rather than a diversity jurisdiction suit, and ADA gave employee the most recovery. 42 U.S.C.A. § 1981a(b)(3)(D); Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[9]** Civil Rights 🗝1574
78k1574 Most Cited Cases
    (Formerly 78k274)
Emotional distress suffered by former employee, following termination, allegedly for bilateral hearing loss, in violation of the ADA, was not garden variety emotional distress, and thus $62,500 award on emotional distress claim was not excessive; employee had sought professional help from clinical psychologist for nine months, employee presented evidence of amount and duration of emotional distress, cried several times during testimony regarding emotional distress, and employee experienced significant weight loss due to the emotional distress. 42 U.S.C.A. § 1981a(b)(3)(D); Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[10]** Civil Rights 🗝1574
78k1574 Most Cited Cases
    (Formerly 78k274)
Award of $62,500 in damages for emotional distress was not miscarriage of justice, on former employee's claim arising from employer's alleged wrongful termination of

Not Reported in F.Supp.2d                                                      Page 3
2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

employee in violation of the ADA, although employee's testimony was sole evidence of
emotional distress, where employee's testimony was neither weak, nor brief, employee
broke down in tears several times, employee testified that he had sought treatment
by clinical psychologist due solely to emotional distress over discharge, and
employee's testimony was credible. 42 U.S.C.A. § 1981a(b)(3)(D); Americans with
Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

OPINION,

GWIN, J.

**\*1** On November 15, 2002, having lost its case to a jury, Defendant Empire Blue
Cross & Blue Shield ("Empire") filed three motions. First, it moved the Court
pursuant to Fed.R.Civ.P. 50(b) for judgment as a matter of law on the punitive
damages and back pay awards. Empire also moved the Court pursuant to Fed.R.Civ.P.
59(a) for a new trial. Finally, Empire asked the Court to lower the punitive and
compensatory damages award and the back pay award.

 For the reasons discussed below, the Court denies all three of Defendant Empire's
motions.

## I. Background

 This case involves claims of disability discrimination under the Americans with
Disabilities Act (the "ADA") and the New York State Human Rights Law ("the NYHRL"). Kuper
is a former Empire employee. Empire fired him from his position as fraudulent claims
manager in July 1998. The jury found that Empire fired Kuper because of his
bilateral hearing loss. Consequently, it awarded Kuper $116,378 in back pay,
$121,122 in front pay, $62,500 for emotional distress, and $200,000 in punitive
damages.

## II. Standard and Analysis
### A. Standard

 Empire filed three motions with the Court. First, pursuant to Fed.R.Civ.P. 50(b) it
seeks judgment as a matter of law. Empire also asks for a new trial. Finally, Empire
moves under Fed.R.Civ.P. 59(a), requesting remittitur as to the damages and back pay
awards.

 The Court now presents the standards for the various motions, and then discusses
each ground in later sections.

### 1. Judgment As a Matter of Law

 Empire first moves for judgment as a matter of law. Fed.R.Civ.P. 50(b) provides:
If, for any reason, the court does not grant a motion for judgment as a matter of
law made at the close of all the evidence, the court is considered to have
submitted the action to the jury subject to the court's later deciding the legal
questions raised by the motion. The movant may renew its request for judgment as a
matter of law by filing a motion no later than 10 days after entry of judgment.
Fed.R.Civ.P. 50(b).

 The moving party bears a heavy burden to prevail on its motion for judgment as a
matter of law. *Stubbs v. Dudley, 849 F.2d 83, 85 (2d Cir.1988),* cert. denied, 489
U.S. 1034, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989). In ruling on such a motion, the
court must "consider the evidence in the light most favorable to the [non moving
party] and ... give that party the benefit of all reasonable inferences that the
jury might have drawn in [its] favor from the evidence." *Smith v. Lightning Bolt
Prod., Inc.,* 861 F.2d 363, 367 (2d Cir.1988). To grant a Rule 50(b) motion, the
court must find that there is " 'such a complete absence of evidence supporting the
verdict that the jury's findings could only have been the result of sheer surmise
and conjecture, or ... such an overwhelming amount of evidence in favor of the
movant that reasonable and fair minded men could not arrive at a verdict against
[it]." ' *Song v. Ives Lab., Inc.,* 957 F.2d 1041, 1046 (2d Cir.1992) (citations
omitted). Weakness of the evidence does not justify judgment as a matter of law; ...

Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 4
2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

the evidence must be such that "a reasonable juror would have been compelled to accept the view of the moving party. *This Is* Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir.1998) (citations omitted).

## 2. Motion for a New Trial

**\*2** Empire also seeks a new trial. Rule 59(a) of the Federal Rules of Civil Procedure states, "[a] new trial may be granted ... for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Fed.R.Civ.P. 59(a). Courts resolve Rule 59 motions under a less stringent standard than Rule 50(b) motions. In contrast to Rule 50(b) motions, under Rule 59 a district court may independently weigh the evidence and need not view the evidence in the light most favorable to the non-movant. Sharkey v. Lasmo (Aul Ltd.), 55 F.Supp.2d 279, 283 (S.D.N.Y.1999), *aff'd,* 214 F.3d 371 (2d Cir.2000). A district court may grant a new trial "if it 'is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.' ' Song, 957 F.2d at 1047 (quotation marks and citation omitted). A court may grant a new trial even where substantial evidence supports the jury's verdict. Byrd v. Blue Ribbon Rural Elec. Co., 356 U.S. 525, 540, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). *See also* Song, 957 F.2d at 1047. However, the Second Circuit has cautioned that "the jury is empowered and capable of evaluating a witness's credibility, and this evaluation should rarely be disturbed." Dunlap-McCuller v. Riese Org., 980 F.2d 153, 158 (2d Cir.1992); *see also* DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir.1998).

## 3. Remittitur

Empire's third alternative request for relief is for remittitur. Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." Earl v. Bouchard Transp. Co., 917 F.2d 1320, 1328 (2d Cir.1990) (quoting Shu-Tao Lin v. McDonnell Douglas Corp., 742 F.2d 45, 49 (2d Cir.1984) (internal quotation marks omitted). Before ordering the plaintiff to make this choice, the court first determines whether the verdict is excessive. If the court determines the award shocks the judicial conscience, it should remit the jury's award to the maximum amount that would not be excessive. Earl, 917 F.2d at 1330. *See also* Pescatore v. Pan Am. World Airways, Inc., 97 F.3d 1, 18 (2d Cir.1996).

To determine whether the award is excessive, it is appropriate to examine awards in similar cases. Lee v. Edwards, 1996 U.S.App. LEXIS 29378, 1996 WL 692403, \*7 (2nd Cir. Oct.31, 1996) (quoting Ismail v. Cohen, 899 F.2d 183, 186 (2nd Cir.1990)). A court should determine whether the award is "within reasonable range," not just "balance the number of high and low awards and reject the verdict in the instant case if the number of lower awards is greater ." Ismail, 899 F.2d at 187. Additionally, in reviewing a damage award, examining the particular facts and circumstances of other cases and comparing them with the current case is important. Scala v. Moore McCormack Lines, Inc., 985 F.2d, 680, 684 (2d Cir.1993). A district court also should not limit its comparison of awards to civil rights claims. Zarcone v. Perry, 572 F.2d 52, 54–55 (2nd Cir.1978) (stating that in federal civil rights claims a court should look at general damages principles). Finally, in making this comparison, the wealth of the defendant may be a factor in determining the size of an award that will adequately deter the defendant from future wrongdoing. Hill v. Airborne Freight Corp., 212 F.Supp.2d 59, 76 (E.D.N.Y.2002).

## B. Discussion

**\*3** Empire makes three claims for relief from the judgment against it. First, it seeks judgment as a matter of law as to the punitive damages and back pay awards. Next, Empire asks the Court to grant a new trial on the punitive and compensatory damages and back pay awards. Alternatively, Empire says that the Court should reduce the amount of the damage and back pay awards. The Court examines each argument in turn.

## 1. Judgment As a Matter of Law

Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.

  Empire moves the Court for judgment as a matter of law on the punitive damages and back pay awards saying that both awards lack evidentiary support. In support of its contention that the punitive damages award lacks evidentiary support, Empire makes two arguments. First, Empire contends that Kuper failed to show that Mary Adam acted with the requisite "malice or reckless indifference" needed to support a punitive damage award. It further argues that even if Adam acted with malice or reckless indifference, the good faith efforts doctrine bars the award of punitive damages.

  As to the backpay award, Empire alleges that the evidence does not support the back pay award because it claims that Kuper did not make reasonably diligent efforts to mitigate his damages.

                        a. Procedural Requirements

  As an initial matter, Kuper says that Empire raised new issues in its motion for judgment as a matter of law that it did not raise pre-verdict. Therefore, he says that the Court cannot consider these new grounds in Empire's Rule 50(b) motion. Empire does not respond.

  Rule 50 allows a defendant, after the close of the plaintiff's case, to move for judgment as a matter of law if, with respect to an issue essential to the plaintiff's case, no legally sufficient evidentiary basis exists for the jury to find in favor of the plaintiff. Fed.R.Civ.P. 50(a). Rule 50(a) further provides that a party must make such a motion with specificity:
  Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. *Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.* Fed.R.Civ.P. 50(a)(2) (emphasis added).

  A party may also make a motion for judgment as a matter of law after judgment, but only if the party made such a motion before submission of the case to the jury. Fed.R.Civ.P. 50(b). Further, a party may only make a post-judgment Rule 50(b) motion based on grounds that it specifically raised at the close of evidence. *Lambert v. Genesee Hosp., 10 F.3d 46, 53-54 (2d Cir.1993).* "The motion 'must at least identify the specific element that the defendant contends is insufficiently supported." ' *Pittman v. Grayson, 149 F.3d 111, 119 (2d Cir.1998)* (quoting *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 286 (2d Cir.1998)).* Although the court must view the specificity requirement in the context of the entire colloquy, *Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 136 (2d Cir.1999)*, "[a] generalized challenge is inadequate." *Pittman, 149 F.3d at 119.*

  **\*4** Courts have held that broad general statements saying that the plaintiff failed to prove any of his claims, *Lambert, 10 F.3d at 54* ("[defendants] move to dismiss this case for failure to make out a prima facie case") or that "defendants move for a directed verdict," *Piesco v. Koch, 12 F.3d 332, 341 (2d Cir.1993)*, do not satisfy the specificity requirement of Rule 50.

  [1] Here, Empire moved for a directed verdict at the close of plaintiff's evidence. The entire exchange was as follows:
  MR. GLASER: Your Honor, if we were planning to make a Rule 50(a) motion, would this be an appropriate time?
  THE COURT: You can make it any time you want. You move for such a directed verdict?
  MR. GLASER: We do move for judgment as a matter of law under Rule 50(a), your Honor.
  THE COURT: I will deny that. I think there is sufficient evidence for the jury to reasonably find in favor of the plaintiff on both the New York State claim and the ADA claim.

  This broad statement does not raise the punitive damages or back pay issues. It also fails to allege the grounds upon which Empire bases its motion. Therefore, Empire does not satisfy Rule 50(a)'s specificity requirement.

                Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.

Because Empire does not meet the Rule 50 specificity requirement, the Court may not grant judgment as a matter of law unless the result is "required to prevent manifest injustice." Galdieri-Ambrosini, 136 F.3d at 287 (citations omitted). A manifest injustice occurs where a jury's verdict is "wholly without legal support." Russo v. State of New York, 672 F.2d 1014, 1022 (2d Cir.1982). Therefore, the Court determines if the jury's punitive damages and back pay awards against Empire are "wholly without legal support."

### b. Punitive Damages Award

Empire says that the Court should grant it judgment as a matter of law on the punitive damages award for two reasons. First, it claims that Adam did not act with the requisite "malice or reckless indifference" necessary to support a punitive damage award. Empire further argues that even if Adam acted with malice or reckless indifference, the good faith efforts doctrine bars the award of punitive damages.

#### *Malicious or Reckless Indifference Showing*

[2] Empire first argues that Adam did not act with the requisite malice or reckless indifference needed to support a punitive damage award. Therefore, Empire says that the jury's punitive damage award is without legal support. This argument fails.

A plaintiff may recover punitive damages under Title VII where he establishes that the employer "engaged in a discriminatory practice ... with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The law imposes employer liability on an employer for the malicious or recklessly indifferent discrimination of its agents where an employee serving in a managerial capacity commits the wrong within the scope of his employment, unless the discriminatory actions were in contravention of the employer's good faith efforts to comply with Title VII. Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 545, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 385 (2d Cir.2001). "[E]gregious" conduct by an employer is not necessary to impose punitive damages. Kolstad at 534. Instead, an employer may be liable for punitive damages in any case where it "discriminate[s] in the face of a perceived risk that its actions will violate federal law." Id. at 536.

*5 Here, Adam admitted she was a "senior officer" and a member of Empire's Medicare Division "senior management team." She testified that she knew the ADA prohibited disability discrimination. She also stated that she had received ADA training. In fact, Adam admitted that, as a senior officer at Empire, she was responsible for ensuring that discrimination did not occur at Empire. The jury also heard testimony that Guder had responsibility to assure compliance with discrimination laws. Both Adam and Guder were involved in Kuper's discharge. "[I]t is particularly egregious for a person responsible for assuring a company's compliance with discrimination laws to fail to determine whether an employee's discharge is for impermissible grounds." Luciano v. Olsten, 912 F.Supp. 663, 670 (E.D.N.Y.1996), aff'd, 110 F.3d 210 (2d Cir.1997) (internal citations omitted).

Additionally, the jury heard testimony that Empire employees gave Kuper false and misleading information about potential jobs after it fired him. Specifically, Kuper testified that immediately after his discharge, he asked Adam's supervisor, Rozzano, to be considered for any available fraud investigator positions. According to Kuper, Rozzano told him he would look into it but did not tell him about any open positions though Rozzano knew that such a position was open. Courts have held that giving this type of false and misleading information about potential jobs supports a finding of malice or reckless indifference. See, e.g., Connolly v Bidermann Indus. USA, Inc., 56 F.Supp.2d 360, 369 (S.D.N.Y.1999) (holding that evidence that employer's president told human resources vice-president that no vacant position existed which discharged employee could fill, although a similar position existed supported a punitive damage award of $350,000); Passatino v. Johnson & Johnson Consumer Prods., 212 F.3d 493, 515–16 (9th Cir.2000) (holding that the fact "that defense witnesses lied about their actions ... including giving [plaintiff] false and misleading information about potential jobs" supported jury's punitive damage award).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7
2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

  Finally, the jury rejected Adams' reasons for firing Kuper as being pretextual
considering the fact that Empire did not follow through with all of the Health Care
and Finance Administration requirements in the draft regulations.

  In sum, the above testimony is sufficient to show that Adam had the requisite
reckless indifference required for a punitive damage award.

                              *Good Faith Efforts*

  [3] Alternatively, Empire argues that even if Adam acted with malice or reckless
indifference, Empire's good faith efforts to comply with the ADA bar the punitive
damage award. Therefore, according to Empire, the jury's punitive damage award is
wholly without legal support. This argument fails to persuade.

  The existence of a written non-discrimination policy made in good faith may operate
as a bar to employer liability. *Kolstad, 527 U .S. at 544.* This good faith defense
requires the employer to establish both that it had an anti-discrimination policy in
place and that it made a good faith effort to enforce it. *Zimmermann, 251 F.3d at
385.* Therefore, a written anti-discrimination policy does not automatically
establish good faith enforcement. *Id. at 386.*

  **\*6** Here, though Empire presented evidence that it had an anti-discrimination
policy, it offered no evidence that it actively enforced that policy. No one
testified at trial about the literature submitted by Empire describing its anti-
discrimination policy to reveal whether and how Empire carried out the plan.
Empire's witness, Rivera, merely identified the plan without discussing more.
Moreover, Empire failed to introduce any training evidence in existence at the time
of Kuper's discharge. The only training evidence that Empire presented was from
1999, after Kuper's discharge. "A dearth of antidiscrimination training during the
time period at issue in [the] lawsuit could actually lead a jury to infer that [the
defendant] did not, in fact, make a good faith effort to enforce such policies."
*Greene v. Coach, Inc., 218 F.Supp.2d 404, 414 (S.D.N.Y.2002).* Therefore, Empire
cannot rely on the good faith efforts doctrine.

  In sum, Empire fails to show that the punitive damages award is wholly without
legal support. Accordingly, the Court finds that the punitive damages award was not
a manifest injustice and denies Empire's motion for judgment as a matter of law as
to the punitive damages award.

                              c. Back Pay Award

  [4] Finally, Empire argues that the back pay award is wholly without legal support
because it says that Kuper failed to mitigate his damages.

  Victims of employment discrimination must mitigate their damages. *Greenway v.
Buffalo Hilton Hotel, 143 F.3d 47, 53 (2d Cir.1998).* Therefore, employment
discrimination plaintiffs must use reasonable diligence to find "other suitable
employment." *Id.* Other suitable employment means that the job must be "substantially
equivalent" to the plaintiff's previous job. *Ford Motor Co. v. EEOC, 458 U.S. 219,
231, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982).* To be substantially similar, "the new
position must afford [the plaintiff] virtually identical promotional opportunities,
compensation, job responsibilities, working conditions and status as the former
position." *Shannon v. Fireman's Fund Ins. Co., 136 F.Supp.2d 225, 229 (S.D.N.Y.2001)*
(quotations omitted). But to satisfy the duty to mitigate, "the unemployed ... need
not go into another line of work, accept a demotion, or take a demeaning position."
*Ford, 458 U.S. at 231.* Furthermore, "[the] claimant's burden is not onerous, and
does not require him to be successful in mitigation." *Dailey v. Societe Generale,
108 F.3d 451, 456 (2d Cir.1997)* (quoting *Rasimas v. Michigan Dep't of Mental Health,
714 F.2d 614, 624 (6th Cir.1983)*)

  Finally, "[w]hile it is the plaintiff's duty to mitigate, it is the defendant who
has the evidentiary burden of demonstrating at trial that a plaintiff has failed to
satisfy this duty." *Clarke v.. Frank, 960 F.2d 1146, 1152 (2d Cir.1992).* To meet
this burden, the defendant must show that suitable work existed and the employee did

Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 8
2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

not make reasonable efforts to obtain it. *Id*. But if the defendant can show that the
plaintiff failed to make a reasonable effort to seek comparable employment, the
defendant is relieved of its burden to prove that suitable work existed. *Greenway,
143 F.3d at 53-55.* Whether this burden is satisfied is a question for the jury.
*Dailey, 108 F.3d at 456.* Further, the court should uphold the jury's findings unless
they are product of sheer surmise or conjecture. *Samuels v. Air Transp. Local 504,
992 F.2d 12, 14 (2d Cir.1993)*.

**\*7** Here, Kuper testified that for the first five months after his discharge, he
contacted "every insurance company in the New York metropolitan area." After these
efforts yielded no results, Kuper reviewed the classified newspaper advertisements
weekly.

Empire argues that these efforts do not constitute a reasonable good-faith job
search. However, courts have held similar efforts to constitute reasonable efforts.
*See, e.g., Epstein v. Kalvin-Miller, 139 F.Supp.2d 469 (S.D.N.Y.2001)* (holding that
a three month effort to obtain suitable employment based on sending resumes and
emails to employment agencies satisfied duty to mitigate); *Harrison v. Indosuez, 6
F.Supp.2d 224 (S.D.N.Y.1998)* (finding that plaintiff made reasonable efforts where
she mailed resumes to all banks in the United States involved in money market
trading, spoke with some of her personal contacts in the industry, and used a
directory to provide leads on potential employers); *Odima v. Westin Tucson Hotel, 53
F.3d 1484, 1497 (9th Cir.1995)* (finding that filing applications, using university's
career placement services, reviewing classified ads, and sending out resumes
established diligent mitigation); *Hanna v. Am. Motors Corp., 724 F.2d 1300, 1309
(7th Cir.1984)* (finding filing applications, reading classified ads, and discussing
employment opportunities with friends to be "more than sufficient to constitute
reasonable diligence"). Further, although Empire contends that Kuper did not respond
to any of the newspaper advertisements, the record contains no evidence to support
these allegations.

In sum, while Kuper could have used other techniques in his job search, the Court
cannot state that he "made no reasonable efforts" at finding employment.

Additionally, Empire did not present any evidence at trial that suitable work
existed. Although Empire did offer expert testimony that "insurance adjustors,
examiners, and investigators had a strong occupational outlook with faster than
average growth expectancy from 1998 to 2000," generalized evidence that the
"industry is doing well" is insufficient to meet the burden to show comparable work
existed. *Zerilli v. New York City Transit Auth., 973 F.Supp. 311, 316
(E.D.N.Y.1997)*. Empire also did not introduce any evidence that comparable
management level jobs in investigatory-based sectors of the insurance industry
existed. Instead, Empire's expert testified that Kuper could have obtained a job as
a claims adjustor. This is insufficient evidence because a claims adjustor position
is not substantially equivalent to a fraudulent claims manager. *See Meschino v.
I.T.T. Corp.,* 1985 U.S. Dist. LEXIS 15017, *5 (S.D.N.Y. Oct. 11, 1985) (finding that
position defendant contended plaintiff should have taken in mitigation "was not
substantially equivalent to plaintiff's earlier position. [That] position ... was
not an executive position. Plaintiff's earlier position ... was an executive
position.").

**\*8** Therefore, the Court concludes that the backpay award is not wholly without
legal support and denies Empire's motion for judgment as a matter of law as to the
back pay award.

### 2. Motion For a New Trial Or Remittitur

Next, Empire moves the Court to grant a new trial on the jury's damages verdicts.
Specifically, it challenges the punitive damages assessment, compensatory damages
award, and the back pay award. Alternatively, Empire asks the Court to grant
remittitur on these three damage awards. The Court considers each award in turn.

### a. Punitive Damages Award

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 9
2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

Empire asserts that the Court should grant either a new trial or remittitur on the punitive damages verdict against it because it says that the verdict was excessive. In gauging excessiveness, the court must keep in mind that the purpose of punitive damages is "to punish the defendant and to deter him and others from similar conduct in the future." *Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir.1992)* (citing *Smith,* 461 U.S. at 54). Thus, the court's task is "to make 'certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.' ' *Id.* at 121 (quoting *Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)*); *see also BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996)* (punitive damages vindicate a state's legitimate interests in punishment and deterrence).

The Supreme Court identified three factors to consider in assessing the validity of a punitive damages award. These factors include: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Gore, 116 S.Ct. at 1598-99* n2.

The Court examines each of the three *Gore* factors in turn.

*Reprehensibility*

[5] Reprehensibility is "perhaps the most important" factor in assessing a punitive damage award. *Id.* at 1599. "That conduct is sufficiently reprehensible to give rise to tort liability, and even a modest award of exemplary damages, does not establish the high degree of culpability that warrants a substantial punitive damages award." *Id.* at 1601. Rather, punitive damages "should reflect the enormity of [a defendant's] offense." *Id.* at 1599 (internal quotation marks and citation omitted). Certain types of "aggravating factors" exist that are "associated with particularly reprehensible conduct" and contribute to the sense that "some wrongs are more blameworthy than others." *Id.* at 1599. Aggravating factors include (1) whether a defendant's conduct was violent or presented a threat of violence, (2) whether a defendant acted with deceit or malice as opposed to acting with mere negligence, (3) whether a defendant has engaged in repeated instances of misconduct. *Id.* at 1599-1600.

**\*9** Here, Empire's conduct was not violent and it did not engage in repeated instances of misconduct. However, evidence exists that Rozzano and Adam acted deceitfully in not telling Kuper about the open fraud investigator position after he asked about available positions. Because " 'trickery and deceit,' are more reprehensible than negligence," *id.,* courts have held that "trickery and deceit" support a punitive damage award. *See, e.g., Connolly, 56 F.Supp.2d at 369; Brabson v. Friendship House of W.N.Y., 46 Fed. Appx. 14, 18-19 (2d Cir.2002); EEOC v. EMC Corp.,* 2000 U.S.App. LEXIS 1941, *10 (6th Cir. Feb. 8, 2000).

Also, Adam testified that not only was she aware of the applicable civil rights laws which prohibit disability discrimination, she also was responsible for ensuring compliance. Courts have held that it is "particularly egregious for a person responsible for a person responsible for assuring a company's compliance with discrimination laws to fail to determine whether an employee's discharge is for impermissible grounds." *See, e.g., Luciano, 912 F.Supp. at 670.* Therefore, the reprehensibility factor supports the punitive damage award and the jury was reasonable in concluding that Adam maliciously fired Kuper because of his disability.

*Ratio of Punitive to Compensatory*

[6] The second factor in the *Gore* analysis is examining the ratio of the punitive damages award to the compensatory damages award. Empire argues that the $200,000 punitive damage award is disproportionate to the $62,500 compensatory damage award. In making this comparison, Empire does not include the $116, 378 back pay award in the compensatory damage award total. The Supreme Court, however, instructs courts to look at the "disparity between the *harm* ... suffered ... and [the] punitive damages

Not Reported in F.Supp.2d                                        Page 10
2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

award," *Gore, 517 U.S. at 574-75* (emphasis added). Further, courts have held that back pay in discrimination cases is part of the harm suffered by plaintiffs facing employment discrimination. *See, e.g., Iannone v. Frederic R. Harris, Inc., 941 F.Supp. 403, 415 (S.D.N.Y.1996)* (stating "[t]he magnitude of injury to the plaintiff in a Title VII action is not measured solely by the award of compensatory damages; it is also reflected in the size of the back pay award."); *Greenbaum v. Svenska Handelsbanken, 67 F.Supp.2d 228, 270 (S.D.N.Y.1999)*.

 Therefore, the Court includes the back pay award in the total compensatory damages award. After including the $116, 378 back pay award in the total compensatory award, the comparison is $200,000 in punitive damages to $178,878 actual damages. This ratio is not excessive.

 Moreover, even if the court does not include the back pay award in the comparison, the resulting ratio, approximately three to one, is still not excessive. The Supreme Court has upheld a ratio of four to one. *Gore, 517 U.S. at 581* (stating "even though a punitive damages award of 'more than 4 times the amount of compensatory damages' might be 'close to the line,' it [does] not 'cross the line into the area of constitutional impropriety' ") (citations omitted).

 **\*10** Finally, the court may consider the defendant's size in evaluating the punitive to compensatory damage ratio. *Iannone v. Frederic R. Harris, Inc., 941 F.Supp. 403, 415 (S.D.N.Y.1996)* (noting that a defendant's wealth is one among many factors to consider in evaluating an appropriate punitive damage ratio). Empire has over six thousand employees and recently paid New York State one billion dollars for the right to become a for-profit corporation.

 In sum, the ratio of compensatory damages to punitive damages supports the jury's punitive damage award against Empire.

*Comparison*

 [7] The final *Gore* factor is "comparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." *Gore, 116 S.Ct. at 1603*.

 Here, Empire has more than six thousand employees. Therefore, section 1981 a(b)(3)(D) limits the amount of compensatory and punitive damages awarded to $300,000. The jury awarded a total of $262,500 for punitive damages. [FN1] Empire claims that the Court should reduce the award because it is close to the statutory maximum and it says that the statutory maximum is reserved for the most egregious cases.

   FN1. For purposes of the statutory cap on damages, the front pay and back pay awards are not included in the computation. *42 U.S.C. § 1981a(b)2*; *Dunlap-McCuller, 980 F.2d at 159*.

 This argument fails. The Second Circuit rejected this reasoning stating,  "[t]he Court has reservations as to the reasoning ... that the maximum award allowable by Title VII should be reserved for the most egregious cases." *Luciano, 912 F.Supp. at 672*.

 The *Luciano* court further noted that:
 [since] one of the purposes of punitive damages is to deter future conduct by inflicting a noticeable financial impact ... [w]ith regard to a company as large and apparently financially well situated as the [defendant], a punitive damage award of $300,000.00 is modest and is certainly suitable and necessary to support the objectives of deterrence and punishment."
 *Id.* Likewise, a punitive damage award of $200,000 is modest and suitable for a corporation as large as Empire. As noted above, Empire has over six thousand employees and recently paid New York State one billion dollars for the right to become a for-profit corporation. Therefore, a comparison of the punitive damages award to available civil penalties supports the jury's punitive damages verdict against Empire.

              Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

### Comparison of Punitive Damages Awards in Similar Cases

Finally, Empire argues that a comparison of similar cases where courts have remitted punitive damages shows that the award here was excessive. Therefore, Empire says that the Court should reduce the punitive damages verdict.

These cases are inapposite. They either involved punitive damage awards that exceeded the statutory maximum, *Lamberson v. Six West Retail Acquisition,* 2002 U.S. Dist. LEXIS 478, *23 (S.D.N.Y.2002), or a high ratio between compensatory and punitive, *Fernandez v. North Shore Orthopedic Surgery & Sports Med.,* 79 F.Supp.2d 197 (E.D.N.Y.2000) (ratio of 100,000 to one because the jury awarded no compensatory damages); *Mahoney v. Canada Dry Bottling Co.,* 1998 U.S. Dist. LEXIS 6576 (E.D.N.Y.1998) (ratio of nineteen to one); *Kim v. Dial Serv. Int'l,* 1997 U.S. Dist. LEXIS 12544 (S.D.N.Y.1997) (award of $750,000 punitive to $25,000 compensatory); *Iannone, 941 F.Supp. at 403 (ratio of 10 to 1),* or both a high ratio and the damage award exceeded the statutory maximum, *Rivera v. Baccarat, Inc., 10 F.Supp.2d 318, remanded on other grounds* (ratio of eighteen to one) (S.D.N.Y.1998). Therefore, the Court finds that the punitive damages award is not excessive.

**\*11** Upon review of the *Gore* factors, the Court concludes that the punitive damage award is not seriously erroneous or a miscarriage of justice. Further, a comparison of the punitive damages award to awards in similar cases shows that it is not excessive. Accordingly, the Court denies Empire's motions for a new trial or remittitur on the punitive damages award against it.

### b. Compensatory Damage Award

Empire also argues that the Court should grant either a new trial or remittitur on the compensatory damage verdict against it because it says the award was excessive. Empire makes two arguments in support of its assertion that the compensatory damages award is a miscarriage of justice and excessive. First, it says the jury's $62,500 verdict is out of line with other garden variety emotional distress awards. Second, Empire contends that the award is excessive in comparison to other awards in cases in which the plaintiff's testimony was the only evidence about emotional distress.

### Shocks the Conscience Standard

[8] Before reaching the merits of Empire's arguments, the Court determines which standard applies. Empire asserts that New York state law governs the analysis of whether the compensatory damage award was excessive. Conversely, Kuper says that federal law applies because the jury award did not exceed the statutory maximum and this is not a diversity action. He is correct.

In a federal question case, a district court ordinarily applies federal law and deems an award excessive if it 'shock[s] the judicial conscience." ' *Pescatore, 97 F.3d at 18* (quoting *Matthews v. CTI Container Transp. Int'l Inc., 871 F.2d 270, 278 (2d Cir.1989)*); *Trivedi v. Cooper,* 1996 U.S. Dist. LEXIS 18715 (S.D. N.Y.1996)(holding that district court applies federal law in determining excessiveness of compensatory damage award where the court has federal question jurisdiction).

Empire, however, claims that despite the existence of federal question jurisdiction, the Court must apply the New York state standard because it says that the NYHRL provides Kuper with the most recovery. This argument does not persuade.

While it is true that courts review awards in cases involving both the ADA and the NYHRL under the theory that gives the plaintiff the most recovery, *Funk v. F & K Supply, Inc., 43 F.Supp.2d 205, 225 (N.D.N.Y.1999),* here Kuper brings the case under the ADA. Under the ADA, the sum of punitive damages and damages for future pecuniary losses and nonpecuniary losses is subject to a cap that varies with the size of the employer. 42 U.S.C. § 1981a(b)(3). For an employer as large as Empire, the cap is $ 300,000. *Id.* § 1981a(b)(3)(D). But for purposes of the cap, compensatory damages do not include backpay. *Id.* § 1981a(b)(2). Further, although the Second Circuit has not directly addressed the issue, it has suggested that front pay is not included

Not Reported in F.Supp.2d                                    Page 12
2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

either. *See, e.g., Dunlap-McCuller v. Riese Org., 980 F.2d 153, 159 (2d Cir.1992)* (remanding to district court for determination of equitable remedy of front pay pursuant to claims of unlawful discrimination under Title VII and Age Discrimination in Employment Act); *Dominic v. Consol. Edison Co., 822 F.2d 1249, 1257-58 (2d Cir.1987)* (stating that in an age discrimination case, front pay is an equitable remedy entrusted to the trial judge); *Whittlesey v. Union Carbide Corp., 742 F.2d 724, 728 (2d Cir.1984)* (finding monetary award of front pay necessary as equitable relief in ADEA claim). *See also Fernandez, 79 F.Supp.2d at 204* (holding that based on a survey of Second Circuit precedent, front pay is not part of the Title VII statutory cap computation).

**\*12** Therefore, for purposes of the ADA statutory cap, Kuper's total punitive and compensatory damages award is $262,500 ($200,000 punitive and $62,500 emotional distress). Accordingly, the ADA gives Kuper the most recovery. Since this is a federal question case and the ADA provides the maximum recovery, the Court applies the federal shocks the conscience standard.

*Garden Variety Emotional Distress*

[9] Having determined that the federal standard governs, the Court turns to Empire's first argument in support of its assertion that the emotional distress claim is a miscarriage of justice and excessive. Empire argues that Kuper suffered only "garden variety" emotional distress. It further notes that the jury awards in cases involving "garden variety" emotional distress generally range from $5,000 to $30,000, lower than the $62,500 damages awarded here. Therefore, it says the award is a miscarriage of justice and excessive. The argument fails.

At trial, Kuper testified to being "devastated" by his discharge and humiliated by his removal from the premises in front of his co-workers and under guard of security like "a common criminal." He also testified that Empire gave up to two weeks to others whose jobs it had eliminated to put their affairs in order and did not make them leave with security exit. Kuper stated that after his discharge he suffered from depression, including a perpetual torpor and insomnia. He also experienced a significant weight loss. Due to these effects, Kuper sought professional help from a clinical psychologist for nine months. Further, Kuper testified that his sex life with his wife had dissolved and his relationship with his wife had strained to the point that "[a] lesser woman would probably have left." Finally, Kuper testified that his distress was ongoing and broke down in tears several times during his testimony.

"A 'garden variety' emotional distress claim is one that did not require medical treatment." *Epstein, 139 F.Supp.2d at 480.* Here, Kuper testified that he sought professional help from a clinical psychologist for nine months. Therefore, Kuper's emotional distress claim is not a "garden variety" emotional distress claim. Moreover, even if Kuper's emotional distress claim had been a more typical claim, courts differ on the amount of award that is appropriate for such claims.

In some cases dealing with typical emotional distress, courts have remitted jury awards for emotional distress to between $5,000 and $30,000. *See, e.g. Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1190 (2d Cir.1992)* (refusing to reduce the "extremely modest" award of $18,000 for emotional distress in age discrimination case where plaintiff testified that he was in a "state of shock"); *McIntosh v. Irving Trust Co., 887 F.Supp. 662, 664-65, 669 (S.D.N.Y.1995)* (remitting $219,428 compensatory damage award to $20,000 where plaintiff testified that he felt humiliated, shocked, and angry, suffered weakness in his legs, and experienced pains in his stomach and chest, but where plaintiff "did not testify in any detail with respect to the magnitude or the duration of any mental distress" and "there was no evidence that the plaintiff sought any medical or psychological help except for one visit to a doctor while he was still employed"); *Binder v. Long Island Lighting Co., 847 F.Supp. 1007, 1028 (E.D.N.Y.1994)* (pain and suffering award of $497,738 remitted to $5,000 where plaintiff testified that his firing "was like taking a cold shower, only much worse" and that "the emotional distress was my inability to support my family"); *Quality Care v. Rosa, 194 A.D.2d 610, 599 N.Y.S.2d 65 (2d Dep't 1993)* (remitting $10,000 emotional distress award to $5,000 where plaintiff testified that

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 13
2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

she was shocked, devastated, and "in a real pickle"); *New York State Office of Mental Retardation & Developmental Disabilities v. State Div. of Human Rights, 183 A.D.2d 943, 583 N.Y.S.2d 580, 581 (3d Dep't 1992)* (remitting $75,000 emotional distress award to $7,500 where "[a]lthough in his testimony respondent described to some extent the anguish and frustration he experienced because of his employer's actions and the humiliation he felt over not being able to pay his bills, ... this testimony was not extensive and was not sufficient").

**\*13** In other typical emotional distress cases, courts have remitted emotional distress awards to between $30,000 and $75,000 where the only evidence of emotional distress has been the plaintiff's testimony, even when the plaintiff claims no physical manifestations. In *Trivedi v. Cooper,* the district court remitted a $700,000 emotional distress award to $50,000 where the evidence of plaintiff's emotional distress from the employment discrimination consisted of only "conclusory statements" by the plaintiff that he felt "insulted, ... indignant, ... unhappy, ... [and] emotionally upset," and he did not claim any physical manifestations of the distress. *1996 WL 724743, \*9 (S.D.N.Y.1996)*. Similarly, in *Tanzini v. Marine Midland Bank, N.A., 978 F.Supp. 70, 77 (N.D.N.Y.1997)*, the court remitted a jury verdict for emotional distress from $170,000 to $30,000 where the evidence of plaintiff's injuries consisted solely of the testimony of plaintiff and his wife that plaintiff was "in a state of shock," traumatized, more argumentative, and having trouble sleeping. *978 F.Supp. at 78-80; see also Lightfoot v. Union Carbide Corp., 901 F.Supp. 166, 170 (S.D.N.Y.1995)* (remitting $750,000 emotional distress award to $75,000).

In all these cases, the emotional distress evidence is generally limited to the plaintiff's testimony, described in vague or conclusory terms, without evidence of the duration, severity or consequences of the condition, and minimal or no evidence exists of medical treatment. Conversely, Kuper did present evidence of the amount and duration of his emotional distress. Moreover, Kuper cried several times during his testimony about his emotional distress. He also testified that he relived his emotional pain every Sunday when he looked at the classified job advertisements. Therefore, the jury had evidence that Kuper's emotional distress was still ongoing at the time of the trial. Further, unlike many plaintiffs in the above-examined cases, Kuper experienced a physical manifestation in his significant weight loss.

Because juries have awarded plaintiffs similar awards for so called "garden variety emotional distress" claims, the Court would not disturb the jury's emotional distress award of $62,500 even if Kuper's claim was a typical emotional distress claim. However, Kuper's emotional distress claim is not of the garden variety, because his distress caused him to seek medical treatment. "[E]vidence that a plaintiff sought medical or psychiatric treatment generally entitles him to greater damages for mental anguish and emotional distress." *Shannon,* 156 F.Supp.2d at 298. Accordingly, the Court concludes that the jury's emotional distress award is not excessive.

### *Plaintiff's Testimony is Sole Evidence of Emotional Distress*

Beyond its garden variety emotional distress argument, Empire alleges that the compensatory damage award is excessive because it says Kuper's testimony was the sole evidence offered about his emotional distress. It says that emotional distress jury awards only range from $5,000 to $15,000 in cases where the plaintiff's testimony was the sole evidence offered about emotional distress. Empire cites multiple cases in support of this contention.

**\*14** First, Empire cites several New York state cases in which the jury awards for emotional distress are based solely on the plaintiff's testimony and range from $5,000 to $15,000. The state cases are *Buffalo Athletic Club v. New York State Div. of Human Rights, 249 A.D.2d 986, 672 N.Y.S.2d 210, 211 (App.Div.1998); Manhattan & Bronx Surface Transit Operating Auth. v. New York State Executive Dep't, 220 A.D.2d 668, 632 N.Y.S.2d 642, 644 (App.Div.1995); Cosmos Forms, Ltd. v. State Div. of Human Rights, 150 A.D.2d 442, 442, 541 N.Y.S.2d 50, 51 (2d Dep't 1989)*; and *Fowler v. New York Transit Auth.,* 2001 U.S. Dist. LEXIS 762 (S.D .N.Y. Jan. 22, 2001).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 14
2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

However, these cases are distinguishable. First, the courts applied the less deferential New York "material deviation standard." The "deviates materially" standard for reviewing jury awards is less deferential to a jury verdict than the federal "shock the conscience" standard because it does not permit a reviewing court to sustain a damage award that is out of line with other awards for similar injuries, even if the amount the jury awarded was not shocking to a court's conscience. *See, e.g., Gasperini v. Ctr. for Humanities, 518 U.S. 415, 424-25, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996)*.

Also, in those state cases the plaintiffs did not present evidence of the duration of the distress, its severity or consequences, its causal connection to the defendant's actions, or of medical treatment. *Buffalo Athletic Club, 672 N.Y.S.2d at 211* (reducing $20,000 award to $10,000 for discriminatory failure to hire where the plaintiff testified that she "felt hurt," was "generally irritable," remained in bed and suffered from headaches and stomach distress, postponed job seeking activities for two months, but did not seek medical treatment); *Manhattan & Bronx Surface Transit Operating Auth., 632 N.Y.S.2d at 644* (reducing award of $30,000 for mental anguish for discriminatory failure to hire to $7,500 where the plaintiff testified that he felt "devastated," that his distress "disturbed his sleep" and caused him to gain weight, exacerbating his high blood pressure, but did not seek medical or psychiatric treatment and there was no indication of the duration of the distress or the causal relation of the weight loss and high blood pressure to the discrimination); *Cosmos Forms, Ltd., 541 N.Y.S.2d at 51* (reducing $35,000 award for discriminatory termination to $5,000 where the only evidence of mental anguish was the complainant's own testimony that she was " 'emotionally and physically screwed up' " and there was no evidence of the duration of her condition, its severity or consequences, or any medical treatment). Here, Kuper did present evidence of the amount, duration, and consequences of his emotional distress.

Also, the *Fowler* case is further distinguishable. In *Fowler,* a case involving race discrimination, sex discrimination, and retaliation claims, the jury found in favor of the plaintiff on her claim that her employer retaliated against her in violation of the NYHRL but it rejected her federal section 1981 and 1983 claims. The jury awarded the plaintiff $50,000 in compensatory damages, but did not award the plaintiff back pay or front pay. The court reviewed the award under the less deferential material deviation New York standard and reduced it to $25,000. *Fowler.,* 2001 U.S. Dist. LEXIS 762 at *30.

**\*15** As evidence of her emotional distress, the plaintiff testified that she suffered headaches and sought professional medical treatment. In reducing the award, the court relied on three rationales. First, the plaintiff admitted that during the time she sought professional therapy, factors other than her work situation contributed to her stress and anxiety. *Id.* at *38. Second, the plaintiff's pre-existing head injury from two prior accidents caused her headaches. *Id.* at *40. Finally, the *Fowler* plaintiff did not suffer a discharge or loss of promotion. *Id.* at *46. Instead, her employer changed her regular days off and deprived her of her desk and keys, among other incidents. *Id.* In contrast, Empire's firing of Kuper was the sole cause of his emotional distress and its physical manifestations. Also, unlike the *Fowler* plaintiff, he lost his job.

Empire also cites federal cases in support of its contention that the compensatory damages award is excessive. These cases are *McIntosh v. Irving Trust Co.* and *Borja-Fierro v. Girozentrale Vienna Bank,* 1994 U.S. Dist. LEXIS 7088 (S.D.N.Y. May 26, 1994). Both cases are distinguishable.

In *McIntosh v. Irving Trust Co.,* a jury awarded $ 219,428 in compensatory damages for emotional distress stemming from an employer's firing of an employee in retaliation for his race discrimination complaints. *McIntosh, 887 F.Supp. at 663.* The evidence at trial consisted solely of the plaintiff's own testimony that he felt "humiliated" during a meeting when his supervisor "interrogated" him, "shocked" and "angry" when his supervisor gave him an unwarranted reprimand and "like dirt" when his supervisor humiliated and embarrassed him in front of the rest of his department. *Id. at 664.* Any physical manifestations of his distress were short-lived. *Id.* The plaintiff stayed home for several days and "saw a doctor once because

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 15
2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

of ailments related to nervous tension, he felt weakness in his legs, had stomach cramps, had chest pains and felt "beaten down" mentally." *Id.* The plaintiff further testified that he had felt "devastated," "angry" and "depressed" upon his termination and that he avoided his family at holidays because of his embarrassment and shame. *Id.* He felt inadequate because his wife had to support him. *Id* . However, the plaintiff introduced no medical evidence and "such sparse evidence with respect to the magnitude and duration of any emotional injury or mental distress that he sustained, [that] the jury was forced to speculate in awarding him compensatory damages." *Id.* at 665. Accordingly, the court reduced the award to $ 20,000. *Id.* at 669.

  In *Borja-Fierro,* a national origin discrimination case, the court reduced a $160,000 emotional distress award to $15,000, reasoning:
    Plaintiff was the sole witness as to his mental anguish. His testimony on this point was brief, not particularly strong, and included a single reference to a visit to a psychologist 'because it really was a combination of the problem that I had in this previous job and also because of the [November 1991 car] accident.'
    **\*16** *Borja-Fierro,* 1994 U.S. Dist. LEXIS at \*9.

  [10] Here, however, Kuper's testimony was neither weak nor brief. In fact, he broke down in tears several times. Further, Kuper testified that his multiple visits to the psychologist were due solely to his emotional distress over his discharge. He also offered evidence of the amount and duration of his distress.

  Finally, two other cases in which the plaintiff's testimony was the only emotional distress evidence merit discussion. In *Broome v. Biondi v. Demou,* 17 F.Supp.2d 211 (S.D.N.Y.1997), a jury awarded $ 114,000 each in emotional distress damages to two tenants after the landlord rejected their residential lease application because of race. *Id. at 223.* One plaintiff testified to having felt "embarrassed and humiliated by the entire approval process and the ultimate denial of [the] sublet application." *Id.* She noted feeling "as if she were experiencing her 'worst nightmare' and being "reduced to tears' " during a cooperative board interview and again when she heard that the landlord had rejected the application. *Id.* Her husband, also a plaintiff, testified that he felt "angry" and "demoralized" by the manner in which the landlord had treated his wife, was angry at himself for not defending himself or his wife at the board meeting and lost confidence at work." *Id.* Both plaintiffs had to pass by the cooperative on a daily basis and were, therefore, reminded of their emotional pain each day. *Id.* Although no tangible injury and no medical evidence existed, the court upheld these awards. *Id.* at 224-25.

  In *Trivedi v. Cooper, 1996 U.S. Dist. LEXIS 18715, 1996 WL 724743 (S.D.N.Y. Dec.17, 1996),* a jury awarded $ 700,000 for emotional distress to a plaintiff who brought employment discrimination claims under 42 U.S.C. § § 1981 and 1983. The court reduced the award to $ 50,000. *Id.* at \*8. The court wrote:
    The only evidence presented to prove emotional distress was Mr. Trivedi's testimony that he felt he was 'starved of professional growth' and that the discrimination made him feel 'like how a woman would feel if her child were lost. On the emotional side I felt insulted, I felt indignant, I felt unhappy, I felt emotionally upset .'
    *Id.*

  The *Trivedi* plaintiff's evidence justified a $50,000 award although he suffered no physical symptoms and he did not describe the magnitude of his distress. In contrast, Kuper identified tangible physical symptoms, noted their extent, and described what he felt with far more specificity and realistic resonance. Further, "because of inflation, an amount that may have been excessive five to ten years ago may be reasonable today." *Shannon,* 156 F. Supp .2d at n. 17 (citing *Luciano, 912 F.Supp. at 673).* Therefore, based on a comparison of other cases in which plaintiff's testimony was the sole evidence about emotional distress, the jury's award does not shock the conscience or constitute a miscarriage of justice.

  **\*17** In sum, based on Kuper's emotional testimony and his demeanor at trial, the Court believes that Kuper came across to the jury as a credible and sympathetic witness. He also came across as a conscientious worker whose work was an essential

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647
**(Cite as: 2003 WL 359462 (S.D.N.Y.))**

element of his identity and of his self-esteem. Therefore, the jury could have
believed that Empire's actions humiliated him. Accordingly, the jury's compensatory
damage award was not a miscarriage of justice. It also was not shockingly excessive.
Therefore, the Court denies Empire's motions for a new trial and remittitur as to
the compensatory damage award against it.

### c. Back Pay

 Finally, Empire argues that the Court should grant a new trial or remittitur on the
jury's back pay award to Kuper because it says it was excessive. In support of this
contention, Empire relies on the same argument it used to assert that the Court
should overturn the backpay award as a matter of law. Specifically, Empire says that
Kuper failed to mitigate his damages. For the reasons discussed above in the motion
for judgment as a matter of law section, the Court rejects this argument.
Accordingly, the Court finds that the back pay award was not excessive or a
miscarriage of justice.

 In sum, the Court finds that the punitive damages, compensatory damages, and
backpay awards were not excessive or a miscarriage of justice.

### III. Conclusion

 For the reasons discussed above, the Court denies Defendant Empire's motions for
judgment as a matter of law, new trial, and remittitur.

 IT IS SO ORDERED.

 2003 WL 359462 (S.D.N.Y.), 14 A.D. Cases 1647

 Motions, Pleadings and Filings (Back to top)

- 1:99CV01190 (Docket)
(Feb. 18, 1999)

END OF DOCUMENT

Copr. ©  2004 West. No Claim to Orig. U.S. Govt. Works.